**Braylon WEBB, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 825–89.**

Court of Criminal Appeals of Texas, En Banc.

Dec. 19, 1990.

David J. Ingram, Longview, for appellant.

David Brabham, Dist. Atty. and C. Patrice Savage, Asst. Dist. Atty., Longview, Robert Huttash, State's Atty., Austin, for the State.

OPINION ON STATE'S PETITION FOR DISCRETIONARY REVIEW

PER CURIAM.

Appellant was convicted by a jury of aggravated robbery. The jury assessed

punishment at twenty (20) years confinement. The Court of Appeals reversed appellant's conviction and ordered an acquittal. *Webb v. State*, No. 12–89–34–CR (Tex. App.—Tyler, delivered April 28, 1989).

We granted the State's petition for discretionary review of the Court of Appeals' holding that the evidence was insufficient to prove appellant caused serious bodily injury to the complainant. We affirm the Court of Appeals.

Appellant was charged with aggravated robbery under Tex.Penal Code Ann. § 29.03(a)(1)—causing serious bodily injury to another person.

The indictment alleges in pertinent part that appellant:

> intentionally, while in the course of committing theft of property and with intent to obtain and maintain control of said property, cause serious bodily injury to [complainant] by striking [complainant] on and about the head with a rock.

"Bodily injury" means physical pain, illness or any impairment of physical condition. Tex.Penal Code Ann. § 1.07(a)(7). "Serious bodily injury" means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ. Tex.Penal Code Ann. § 1.07(a)(34).

■ In reviewing sufficiency of the evidence the standard is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). *Carlsen v. State*, 654 S.W.2d 444 (Tex.Cr.App.1983) (Opinion on Reh'g).

The complainant, Daniel Webb, not related to appellant, testified as follows:

A: [J]ust as I was about to open the register, I got hit. Well, I didn't know that I got hit, but I was standing ten feet to my right.

Q: You say you didn't know you got hit. Do you mean something knocked you about ten feet away?

A: Yeah. I looked down to open the cash register. And just as I hit the button, the next thing I know, I'm standing ten feet away from where I was before.

    \*     \*     \*     \*     \*     \*

Q: You say you turned—did you ever lose consciousness at this point?

A: Not at this point.

Q: Okay. Did you fall down or anything, or did you always stay on your feet?

A: I nearly fell down, but I didn't go to my knees.

Q: Did you call the police?

A: Yes, I did.

    \*     \*     \*     \*     \*     \*

Q: Did it take very long for the police to get there?

A: I don't recall.

Q: Did you have an opportunity to talk with the police after they arrived at Shipley's Donuts?

A: I don't recall talking to them, because after I talked with the police, they said lock the doors. And I did that, and then I went and sat down. And I lost mental consciousness.

Q: Isn't it a fact that because of the blow to your jaw, you still are a little hazy about events that occurred after you hung up the phone?

A: Yes, sir.

Q: Did you later receive medical attention?

A: Yes, I did.

Q: Where did you go to receive that medical attention?

A: I went to Good Shepherd Hospital.

Q: Okay. What happened when you first got to Good Shepherd? Were they able to determine the extent of your injuries?

A: I had to stay there overnight so that they could monitor me in case anything—to see if I had a severe concussion or anything.

Q: Did you have a concussion?

A: I'm not really quite sure.

Q: Okay.

A: I didn't find that out.

Q: Did they perform any x-rays or anything?

A: I believe they did.

Q: Did you later have to go back to the hospital for some surgery to correct a problem that you had?

A: Yes, I went the Friday of that same week.

Q: And why did you go back on Friday? What did they have to do?

A: I had to go in for surgery. And they made an incision up in my hair line, and came down and put the bone that was broken in three places back together, and put a pin just on the inside to give it support.

The State introduced into evidence the photograph taken on the day of the offense showing a laceration on the left side of Daniel Webb's face. After being shown the photograph, the complainant testified:

Q: And do you recall when that photograph was taken?

A: I don't remember when it was taken.

Q: Okay. Was it the day that you were injured?

A: Yes, it was that day.

Q: Okay. You just don't remember the exact time?

A: Yeah.

Police officer Carlos Samples testified as follows:

Q: Do you recall about how long it took you to get over there [to the scene of the offense]?

A: Approximately two minutes from the time I was sent there by my field sergeant.

Q: And what happened when you go[t] there?

A: I arrived, and I noticed the cashier was standing on the inside. He looked out and saw me, and he walked over to the door, unlocked it, and let me in.

Q: Did you notice anything wrong with him?

A: Well, he was—he seemed dazed. He had blood coming down the left side of his face. And I immediately noticed a couple of rocks laying on the inside of the store.

Q: And where were the rocks located?

A: Okay. One rock—the larger one was located right on the door mat as you go inside the business. The other one was located on the counter area broken into two pieces.

Q: Did you feel like the attendant—the victim needed medical attention?

A: Yes, I did.

Q: Did you try and communicate with him at that time or were you more concerned about his physical well-being?

A: I was concerned about his physical well-being at that time. I asked him a couple of questions. He seemed unresponsive. I could look in his eyes and tell he was kind of dazed.

Q: Did the injury appear to you to be fairly significant?

A: Yes, it did.

\* \* \* \* \* \*

Q: Officer Samples, you have been a police officer for two years now. Do you see many cases where people have been assaulted by various items?

A: Yes, sir.

Q: Based on your experience as a police officer, is it your opinion that such an item as the rock that I've introduced into evidence that was broken, is it your opinion that such an item could, if used as a weapon to the head, create a substantial risk of death?

A: Yes, sir, it could.

Police officer Henry Mize testified that he went to the hospital on the day of the offense and attempted to interview the victim. Mize found it impossible to interview him because "he appeared to be very disoriented and dazed from the blow he had received in the assault."

The Court of Appeals summarized the facts and stated:

There is no medical evidence regarding Daniel Webb's injuries or the severity thereof. There is no evidence of any continuing effects of the injuries, nor

was any permanent disfigurement shown. The lack of any such evidence precludes a rational finding that Daniel Webb's injury created "serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ."

In a similar vein, we find the evidence insufficient to support a finding that Daniel Webb's actual injuries created a substantial risk of death.

*Webb*, slip op. at 2.

The court then quoted the following from *Moore v. State*, 739 S.W.2d 347, 352 (Tex. Cr.App.1987):

[I]n order for the prosecution to establish that the bodily injury was in fact a serious bodily injury, it is incumbent upon the prosecution not only to present evidence that the victim sustained a bodily injury, it is also incumbent upon the prosecution to establish by competent and relevant evidence beyond a reasonable doubt that the injury was life threatening; i.e., that it was so grave or serious that it must be regarded as differing in kind, and not merely in degree, from other bodily harm.... In other words, the prosecution must present relevant and probative evidence from which a rational trier of fact could infer beyond a reasonable doubt that the bodily injury the victim sustained created a substantial risk of death from the injury itself, and not from some hypothetical or mere possibility that the bodily injury created a substantial risk of death.

The Court of Appeals concluded:

Although in this case the prosecution did establish that the victim suffered bodily injury, there is no evidence that the injury sustained was life threatening. The opinion of the police officers—that a blow to the head with the rock *could* create a substantial risk of death—was insufficient to show that this victim's injury actually created a substantial risk of death.

*Webb*, slip op. at 3 (footnote and citation omitted).

In short, the Court of Appeals correctly held that there was evidence of bodily injury, but there was no evidence that the injury was life threatening.

■ The State argues that the complainant's testimony about the surgery was by itself sufficient evidence of serious bodily injury.

In *Brown v. State*, 605 S.W.2d 572 (Tex. Cr.App.1980), an aggravated rape case, the victim's nose was broken. The injury was medically treated and the bone was set. We held that the setting of the bone did not make the evidence insufficient. There was evidence that the injury would cause disfigurement and dysfunction of the nose if the bone had not been set. Since the issue was the disfiguring and impairing quality of the injury as it was inflicted, and not after the effects had been ameliorated or exacerbated by medical treatment, we found the evidence was sufficient to show serious bodily injury. *Id.* at 575.

In the present case, unlike in *Brown*, there was no evidence that the complainant's injury, without the surgery, would have caused permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ. See *Moore*, 739 S.W.2d at 351.

In *Fancher v. State*, 659 S.W.2d 836 (Tex.Cr.App.1983), also an aggravated rape case, the defendant was convicted of causing serious bodily injury to the child by hitting her on the head with a rock. The victim received a five-inch skull fracture and a deep laceration, which required stitches, as a result of the blow she sustained. A physician described her condition as "serious." She was hospitalized and kept under observation for nine days because of her head injury and extensive vaginal surgery. At the time of trial, ninety days after the offense, the child had pink scar tissue over her left eye. Her physician testified that he could not make a long term disfiguration prediction. In light of *Brown*, 605 S.W.2d 572, however, we found the evidence was sufficient to show that the child sustained serious bodily injury. *Fancher*, 659 S.W.2d at 838.

As for surgery itself as proof of serious bodily injury we stated in *Williams v.*

*State.* 696 S.W.2d 896, 898 (Tex.Cr.App. 1985), that a knife or a gunshot wound, although caused by a deadly weapon, is not, per se, serious bodily injury. We recognized that while such an occurrence was a serious and grave matter, the State was nevertheless required to prove serious bodily injury under § 1.07(a)(34).

Similarly, surgery is not evidence of serious bodily injury, per se. In *Black v. State,* 637 S.W.2d 923 (Tex.Cr.App.1982), an aggravated robbery case, a doctor performed surgery on the complainant's gunshot wound in the thigh. He spent three days in the hospital recovering from the surgery, and the leg took two to three months to heal. There was no evidence, however, that he had any loss of use of the leg. We held that the evidence was insufficient to prove serious bodily injury. *Id.* at 926.

The State further contends that a protracted loss or impairment of a bodily organ was shown by evidence of the complainant's loss of memory about the events after he talked with the police on the phone. At trial, Daniel Webb did not recall talking to the police when they arrived. He also did not remember the exact time of day his photograph was taken. He testified that he was "still a little hazy" about what transpired after he called the police. Based on this evidence the State argues that appellant was suffering from amnesia at trial, three months after the offense, and that this showed a protracted loss or impairment of the function of his brain.

In *Sanchez v. State,* 543 S.W.2d 132 (Tex.Cr.App.1976), two aggravated assault cases, the victim was in a fight with the defendants. The victim testified that as a result of the fight he lost consciousness and that he was suffering from amnesia because he could not remember what had happened between the time he was beaten up and the time he awoke in the hospital. He also could not remember any parts of the play he had seen before the fight. He further testified that he could remember everything else, including the details of the fight. We held that the victim's own testimony as to his temporary amnesia was insufficient to show a protracted loss or impairment of any bodily member or organ. *Id.* at 134.

As in *Sanchez,* Daniel Webb's haziness shows the temporary inability of his brain to comprehend and retain information for a short period after he phoned the police and passed out. The evidence was insufficient to prove a protracted loss or impairment of the function of an organ.

The Court of Appeals correctly determined the evidence was insufficient to prove serious bodily injury. Accordingly, the judgment of the Court of Appeals is affirmed.

McCORMICK, P.J., and DAVIS and WHITE, JJ., dissent to this opinion.