Aaron Isaac FLEMING, Appellant,

v.

The STATE of Texas, Appellee.

No. 09–97–186 CR.

Court of Appeals of Texas,
Beaumont.

Submitted Dec. 17, 1998.

Decided Feb. 17, 1999.

Daniel C. Keele, Houston, for appellant.

Michael R. Little, District Attorney, Cheryl Swope Lieck, Assistant District Attorney, Liberty, for State.

Before WALKER, C.J., BURGESS and STOVER, JJ.

## OPINION

RONALD L. WALKER, Chief Justice.

In a single indictment, appellant was charged with three separate offenses arising out of the same incident involving the collision of two motor vehicles. In count one, appellant was charged with the felony offense of Intoxication Assault, the victim being Clifford Howard. Howard was the passenger in the vehicle appellant was operating at the time of the collision. The second count again charged appellant with Intoxication Assault, the victim being William Randall Bivins, the driver of the other vehicle involved in the collision. The third count charged appellant with having committed the felony offense of Aggravated Assault. Count three was divided into two separate paragraphs. The first paragraph alleged that appellant intentionally, knowingly, and recklessly caused "serious bodily injury to William Randall Bivins by driving a motor vehicle into a motor vehicle occupied by the said William Randall Bivins[.]" The second paragraph of count three alleged that appellant intentionally, knowingly, and recklessly caused "bodily injury to William Randall Bivins by driving a motor vehicle into a motor vehicle occupied by the said William Randall Bivins, and the defendant did then and there use and exhibit a deadly weapon, to-wit: a motor vehicle[.]" A jury convicted appellant on all three counts and assessed punishment. In counts one and two, the punishments were assessed at confinement in the Texas Department of Criminal Justice—Institutional Division for a term of two (2) years and a fine of $500. Incarceration of appellant in counts one and two was suspended and appellant was placed on community supervision. However, in count three, the jury assessed punishment at confinement in the Texas Department of Criminal Justice—Institutional Division for a term of five (5) years. No community supervision was recommended by the jury for count three. The jury also made, with regard to count three, an affirmative finding of the use or exhibition of a deadly weapon by appellant. Appellant raises six appellate issues for our consideration.

Points three and four complain of the sufficiency of the evidence to sustain certain jury findings. We will address these appellate issues first. The scope of review for points three and four will be for legally sufficient evidence and not factually sufficient evidence as appellant has not properly raised or briefed the issue of factual insufficiency. *See Clewis v. State,* 922 S.W.2d 126, 133 (Tex. Crim.App.1996); and *Alvarado v. State,* 912 S.W.2d 199, 210 (Tex.Crim.App.1995).

Point three contends a lack of sufficient evidence to sustain appellant's convic-

tions because "there was no serious bodily injury involved in any of the three charges against him." In reviewing a record for legal sufficiency, we view the evidence in the light most favorable to the verdict, and then determine whether any rational trier of fact could have found all of the essential elements of the offense proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Santellan v. State*, 939 S.W.2d 155, 160 (Tex.Crim.App. 1997). "Serious bodily injury" is defined in TEX. PEN.CODE ANN. § 1.07(a)(46) (Vernon 1994), as "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." The term "bodily injury" is also defined in § 1.07(a)(8) of the Penal Code as "physical pain, illness, or any impairment of physical condition." The Court of Criminal Appeals in *Moore v. State*, 739 S.W.2d 347 (Tex.Crim.App.1987), carefully examined the issue as to what constituted legally sufficient evidence to support a jury's implicit finding of "serious bodily injury" in an aggravated assault conviction. After defining the terms "serious bodily injury" and "bodily injury," the Court expressed the following:

> By virtue of the fact that the Penal Code provides a different definition for "bodily injury" from "serious bodily injury", though often a matter of degree, we must presume that the Legislature intended that there be a meaningful difference or distinction between "bodily injury" and "serious bodily injury." Understandably, this means that where the issue is raised, the issue must be determined on an ad hoc basis.

*Id.* at 349. The Court continued this line of contrasting "bodily injury" with "serious bodily injury" when it later observed:

> Given the fact that the Legislature placed into the Penal Code separate definitions for "bodily injury" and "serious bodily injury", it is obvious that its intent was not to make the term "bodily injury" the equivalent of the term "serious bodily injury". By what the Legislature has done, it is also obvious that it did not intend for the prosecution, in establishing its case against the accused, to be able to elevate through hypothetical questions a "bodily injury" to a "serious bodily injury".

*Id.* at 354. Having provided the above salient legal points of reference, we turn to the evidence contained in the record before us.

Recall the fact that there were two victims in the instant prosecution: Clifford Howard, and William Bivins. During direct examination by the State, Howard testified as follows concerning the injuries he sustained in the collision:

Q.[State] And what type of injuries did you suffer?

A.[Howard] A broke leg, a broke hip and a fractured pelvis.

Q. Would you consider those injuries serious?

A. Yes, ma'am.

Q. Did you have to have surgery because of your injuries?

A. Yes, ma'am.

Q. How many surgeries have you had?

A. Just the one.

Q. In that one surgery, what was done? What operation or what procedure was performed?

A. They cut my kneecap open and moved it out of the way and inserted a rod up through the bone and cut me from my kneecap all the way up to my hip where they inserted a plate and six screws.

Q. So, how long was the surgery?

A. I would have no idea. I was out.

Q. I understand that. But do you have any idea about what time you went in and about what time you came out of surgery?

A. No, ma'am. I was in so much pain, I couldn't recall.

. . . .

Q. So, you would consider— would you consider your injuries to have some prolonged impairment on your ability?

A. Yes, ma'am.

On cross-examination, Howard's injuries were briefly touched upon:

Q.[Trial counsel] You said that you had a broken leg and a broken hip; is that correct?

A.[Howard] Yes.

Q. Would you consider those injuries to be life-threatening?

A. No, sir.

Q. Are you impaired in any way? Are you drawing any kind of disability because of this?

A. No, sir.

Q. Do you feel that you're impaired?

A. I'm not in the same physical condition I was. That's all I can say about it.

Trooper Jeff Johnson of the Texas Department of Public Safety was called to the scene of the collision. Trooper Johnson testified that when he arrived at the scene, Howard was pinned inside appellant's vehicle, and the fire department was trying to extract him from the vehicle. Because emergency medical personnel were working on Howard, Trooper Johnson never did speak to Howard. The only other evidence as to Howard's condition following the collision was appellant's testimony that he could see that "Clifford was pretty banged up, you know[,]" and the testimony of William Randall Bivins during his direct examination as set out below.

Bivins, the other victim, provided testimony of events he witnessed leading up to and immediately following the collision. As an initial observation of said testimony, we note the striking contrast between Bivins' description of the severity of the collision and the apparent lack of objectively or subjectively discernable injuries to Bivins himself. We reproduce portions of Bivins' testimony significant in their description of his physical condition following the collision and of the eventual diagnosis of his injuries:

Q.[State] So, when you all impacted, when your two vehicles collided, was it head-on?

A.[Bivins] It wasn't directly head-on. He came off the— this side of the road. He was completely out of control and off the road, and the main impact was just off center of my truck and full front of his truck.-

Q. Okay. What lane was he in when he hit your truck?

A. He was in my lane.

. . . .

Q. Okay. Randy, after you had— after you all collided, what did you do? What was the first thing you did?

A. The first thing I did was my motor was still running. I could see the two occupants of the other vehicle kind of moving around. I turned my engine off. Had a can of ether or something that had been ruptured during the impact.

Made sure I could get my door open. I threw that can of ether out because I was concerned about fire. I didn't see any fire from his vehicle or mine. I guess I was more overwhelmed with all the damage inside the cab.

Q. So, you got out of your vehicle at some point?

A. I got out.

Q. Did you ever approach the Defendant's vehicle?

A. Not right off the bat, no, ma'am.

. . . .

Q. And when you approached, what did you notice?

A. The passenger, I could tell that he was in more critical condition than the driver. Passer-byers had already stopped.

Prior to me going close to his truck, I'd already found my cell phone and had noticed someone that came out of the Y was already on the phone; so, I had already contacted my wife to let her know I was in an accident.

When I walked around the truck that hit me, some people were already attending to the passenger. The passenger was wanting to get out of the truck but couldn't. I went around to the driver and—

. . . .

Q. So, you approached the driver?

A. I approached the driver and nobody was at the window talking to him or anything, and he asked me if I could help him get out.

And I asked him, "Are you hurt?" He said, "I just want to get out." So, I— the door was jammed and I pulled on it. He

kind of pushed on it a little bit and we got it open. He stepped out and immediately said twice, "Man, I'm sorry. Man, I'm sorry."

. . . .

Q. Mr.—— Randy, as a result of the accident, did you suffer any injuries?

A. Yes, ma'am.

Q. Did you go to the hospital, the emergency room that day?

A. No, ma'am.

Q. Why didn't you go?

A. I was advised before I left—— I told DPS that I'd probably go to Cleveland. And he told me that they only had one x-ray machine, it would probably be tied up late in the night with the two people in the other vehicle. And my only other option was to go to Liberty and I opted just to go home. I was ready to go home. It was 9:30 at night. So, that's what we did.

Q. So, when did you first go to see a doctor?

A. Went to the doctor Monday morning.

Q. This wreck happened on what day of the week?

A. Saturday evening.

Q. So, what doctor did you go to?

A. I went to Dr. Redmond in Dayton.

Q. And then were you diagnosed at that point?

A. He took x-rays of my hand, my neck and my right knee, and pretty much told me I'd been in a bad accident. And that angered me.

So, I went and I talked to my insurance agent. They said go to any doctor you want. So, I went to two specialists in Houston, one more for my hand and one for my knee.

Q. What were your injuries? Let's start with your knee. What were your injuries to your knee?

A. Had a torn medial meniscus, which is cartilage tear on the inside of my knee.

Q. What was wrong with your hand?

A. After x-rays the doctor said I just had a severely jammed hand.

Q. Did you ever have surgery on either one of your injuries?

A. I had surgery on my right knee.

Q. When was your surgery?

A. It was four days before Thanksgiving of '95.

Q. What did that surgery entail? You said you had torn cartilage. What did they do when they went in?

A. Had arthroscopic surgery. They went in and removed the torn cartilage and clipped it off.

Q. Has your knee bothered you or have you had problems with your knee since your surgery?

A. Yes, ma'am.

Q. Have you had problems with your hand since your surgery?

A. Yes, ma'am. Now it hurts all the way up to my elbow.

Q. So, your injuries have been aggravated?

A. Yes, ma'am.

Q. In your opinion, Randy, did you suffer serious bodily injury?

[Trial Counsel]: I object. He's not qualified to state an opinion on that matter, Your Honor.

[State]: Your Honor, it's his body. I think he can testify what his opinion is.

THE COURT: You all approach the Bench.

(WHEREUPON, THERE WAS AN OFF–THE–RECORD DISCUSSION AT THE BENCH, AFTER WHICH THE FOLLOWING PROCEEDINGS WERE HELD IN THE PRESENCE OF THE JURY, TO–WIT:)

THE COURT: Sustain the objection.

Q. Randy, when you talked to your doctors about your prognosis for both of your injuries, did they ever indicate to you that you were going to have prolonged problems?

[Trial Counsel]: Objection to hearsay, Your Honor.

. . . .

THE COURT: That is sustained. Yes.

Q. Have you had problems with your injuries since the accident?

A. Yes, ma'am. It still hurts.

Q. How much work have you missed, Randy, because of the accident and your injuries?

A. Up until the time of my accident I'd not missed a day of work in 13 years. Because of the surgery I missed right at six weeks of work. Not to mention longer than that, three and a half months that my stump removal business was completely out of service.

Cross-examination of Bivins regarding his injuries consisted of this brief exchange:

Q.[Trial Counsel] Would you consider your injuries life-threatening that you sustained in this accident?

A.[Bivins] At the time of the accident?

Q. Yes, sir.

A. No, sir.

The evidence as to the injuries sustained by Howard and Bivins is certainly legally sufficient proof of "bodily injury" as defined in the Penal Code. The question, however, is whether the evidence is legally sufficient to prove "serious bodily injury." Such an issue was raised in *Webb v. State*, 801 S.W.2d 529 (Tex.Crim.App.1990). In *Webb*, an aggravated robbery case, the victim was alleged to have sustained "serious bodily injury" by having been struck on the head with a rock. *Id.* at 530. At trial, the victim testified that as a result of the blow from the defendant, he lost consciousness. *Id.* The victim was taken to the hospital for observation, and later had surgery in which doctors "made an incision up in my hair line, and came down and put the bone that was broken in three places back together, and put a pin just on the inside to give it support." *Id.* at 531. A photograph was also introduced into evidence showing a laceration on the left side of the victim's face as a result of the blow by the defendant. *Id.* Police officers further testified that in talking to the victim at the scene of the robbery, he seemed "dazed," "disoriented," and had blood on his face. *Id.* On appeal, the State argued that the victim's testimony about the surgery was by itself sufficient evidence of serious bodily injury. In affirming the Court of Appeals' reversal of

Webb's conviction, the Court of Criminal Appeals stated the following:

In *Brown v. State*, 605 S.W.2d 572 (Tex. Cr.App.1980), an aggravated rape case, the victim's nose was broken. The injury was medically treated and the bone was set. We held that the setting of the bone did not make the evidence insufficient. There was evidence that the injury would cause disfigurement and dysfunction of the nose if the bone had not been set. Since the issue was the disfiguring and impairing quality of the injury as it was inflicted, and not after the effects had been ameliorated or exacerbated by medical treatment, we found the evidence was sufficient to show serious bodily injury. *Id.* at 575.

In the present case, unlike in *Brown*, there was no evidence that the complainant's injury, without the surgery, would have caused permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ. See *Moore*, 739 S.W.2d at 351.

. . . .

As for surgery itself as proof of serious bodily injury we stated in *Williams v. State*, 696 S.W.2d 896, 898 (Tex.Cr.App. 1985), that a knife or gunshot wound, although caused by a deadly weapon, is not, per se, serious bodily injury. We recognized that while such an occurrence was a serious and grave matter, the State was nevertheless required to prove serious bodily injury under § 1.07(a)([46]).

Similarly, surgery is not evidence of serious bodily injury, per se. In *Black v. State*, 637 S.W.2d 923 (Tex.Cr.App.1982), an aggravated robbery case, a doctor performed surgery on the complainant's gunshot wound in the thigh. He spent three days in the hospital recovering from the surgery, and the leg took two to three months to heal. There was no evidence, however, that he had any loss of use of the leg. We held that the evidence was insufficient to prove serious bodily injury. *Id.* at 926.

*Id.* at 532–33. In *Hernandez v. State*, 946 S.W.2d 108 (Tex.App.—El Paso 1997, no pet.), another aggravated robbery in which the victim was stabbed with a knife, the State

contended, among other things, that because the victim's physician had ordered him not to work for six weeks following surgery which treated the stab wound, evidence was legally sufficient to prove serious bodily injury through protracted impairment. In finding the evidence insufficient, the El Paso Court observed the following:

> Protracted impairment means that some function of either an organ or body member must be impaired. *Moore*, 739 S.W.2d at 356 (Clinton, J. concurring). But, again, there was no evidence offered of impairment of a member or organ. Nor was there evidence that Mr. Ramirez was restricted in any particular physical activity. This period of recuperation does not elevate bodily injury to serious bodily injury but at best shows only some impairment of physical condition. *See Moore*, 739 S.W.2d at 356.

*Id.* at 113.

While it is not mandatory for the State to establish serious bodily injury through an expert, i.e., a physician, we have observed it to be the better way to prove up the issue. *See Carter v. State*, 678 S.W.2d 155, 157 (Tex.App.—Beaumont 1984, no pet.). In *Carter*, we held that where the injury and its effects are obvious, proof of serious bodily injury from an expert was not indispensable. *Id.* Nevertheless, the State must present relevant and probative evidence from which the trier of fact could infer beyond a reasonable doubt that the injury *itself* resulted in "serious bodily injury." *See Moore*, 739 S.W.2d at 352.

■ In the instant case, the State argues that the evidence of the injuries to both Howard and Bivins was sufficient to prove that portion of § 1.07(a)(46) which provides that "serious bodily injury" is "protracted loss or impairment of the function of any bodily member or organ." While it is a very close call, we feel that, taken in the light most favorable to the verdict, a rational trier of fact could have found Clifford Howard sustained serious bodily injury in the collision caused by appellant. The evidence of the circumstances surrounding the collision indicate that Howard was pinned inside the vehicle and was by all accounts in poor condition.

Howard sustained a broken leg, a broken hip, and a fractured pelvis. Howard's brief but graphic description of the surgical procedure is at least some evidence indicative of the seriousness of his injuries. The fact that the doctors "inserted a rod up through the bone" appears to indicate a possible compound fracture of the large bone that runs through the thigh. Also, the fact that a metal plate was attached to his pelvis with six screws appears to indicate that the fracture was significantly more than a mere "hairline." A reasonable inference could be made that, at the time of injury, both the leg and the pelvis would have been unable to support Howard's weight if he were to attempt any ambulatory movements. Howard also testified that the "injuries" resulted in "prolonged impairment" of his "ability." All of the above evidence taken together is at least some evidence of protracted loss or impairment of Howard's leg and/or pelvis so as to permit the factfinder to infer the existence of serious bodily injury. In sum, we find the above-described evidence to be legally sufficient to sustain appellant's conviction under count one of the indictment, the Intoxication Assault of Clifford Howard. Point three is therefore overruled as to count one.

■ The evidence as to William Randall Bivins' injuries, however, is another matter. From Bivins' own testimony of his actions immediately following the collision there is absolutely no indication of any bodily injury sustained at all, much less serious bodily injury. Bivins' testimony does not indicate that he was in any pain or discomfort at the scene of the accident or even when he consulted Dr. Redmond two days after the accident. After being told that x-rays indicated a "cartilage tear" in his knee and a "severely jammed hand" were his injuries, there is, again, no evidence that Bivins is in any discomfort or pain, nor is there any evidence that the doctor ordered immediate medical treatment or even a cessation of activities by Bivins so as to prevent worsening of his injuries. Indeed, the evidence indicates that the collision occurred on October 15, 1995, and Bivins' knee surgery took place over one month later. The questions next propounded to Bivins by the State are as to "problems"

with his knee or hand "since your surgery." To both questions, Bivins responded with an unembellished "Yes, ma'am." As to problems with his injuries since the accident, Bivins replied that they still hurt, and that he missed work during his recuperation from his knee surgery.

From the above-described evidence as to Bivins' injuries, we find nothing which would permit even the inference of protracted loss or impairment of either Bivins' knee or his hand as a result of the collision. The fact that "It still hurts," provides evidence of bodily injury, but not serious bodily injury. Bivins was certainly ambulatory immediately following the collision and for some time afterward. There is no evidence that either his knee or his hand thereafter deteriorated to a point of protracted loss or impairment of either body part. We therefore find that the evidence is legally insufficient to sustain appellant's conviction under count two of the indictment, the Intoxication Assault of William Randall Bivins. Point three is sustained as to count two.

As for count three, the Aggravated Assault of Bivins, recall that the State alleged that the appellant caused Bivins serious bodily injury in paragraph one and that appellant caused bodily injury to Bivins by use of a deadly weapon in paragraph two. Since the State was not required to prove both, and we have already held the evidence of "bodily injury" to have been legally sufficient, point three is overruled as to count three of the indictment. To summarize, point three is overruled as to counts one and three, and sustained as to count two.

■ Point four complains of the lack of sufficient evidence for an affirmative finding of the use of a deadly weapon "when there was no serious bodily injury involved in any of the three charges against him[.]" At the outset, we note that the only count in which a deadly weapon was alleged was count three, the Aggravated Assault allegation. The deadly weapon in question was appellant's motor vehicle. It is clear that motor vehicles are not made or adapted for the purpose of inflicting death or serious bodily injury, so they are not "deadly weapons" per se as defined under TEX. PEN.CODE ANN.

§ 1.07(a)(17)(A) (Vernon 1994). However, items that are not deadly weapons per se have been found to be deadly weapons by nature of their "use or intended use" under § 1.07(a)(17)(B). *See Hill v. State*, 913 S.W.2d 581, 582–83 (Tex.Crim.App.1996). The use or intended use must be capable of causing death or serious bodily injury. *Id.* at 583. In the instant case, Trooper Johnson testified that a motor vehicle is a deadly weapon because "[d]riven in a reckless manner, it's a 3,000 pound hunk of metal and it can cause serious bodily injury and/or death." Appellant does not contest the sufficiency of the evidence that he intentionally, knowingly, or recklessly caused bodily injury to William Bivins by driving a motor vehicle into a motor vehicle occupied by Bivins. It is the manner of appellant's use or intended use of his vehicle that is the basis for the affirmative finding, not whether or not Bivins was killed or sustained serious bodily injury. So long as appellant's use or intended use of his vehicle was *"capable"* of causing death or serious bodily injury to Bivins, the evidence would be sufficient to sustain the affirmative finding. The evidence in the instant case was legally sufficient to support any rational trier of fact's finding that appellant used or exhibited a deadly weapon in the commission of the offense of Aggravated Assault. Point four is overruled.

■ Appellant's first two points contend that the State violated his rights against illegal search and seizure by procuring appellant's medical records as well as information contained in his medical records because said information was procured without a search warrant and in violation of the state and federal constitutions and the Texas exclusionary rule. The specific information in question is appellant's blood alcohol content. A pretrial suppression hearing was conducted by the trial court. Trooper Johnson and appellant were the only witnesses at the hearing. Johnson testified that he was notified of the accident at about 6:38 p.m., and arrived on the scene at about 6:59 p.m. Johnson then remained at the accident scene while appellant and Clifford Howard were taken to the hospital. Johnson left the accident scene and arrived at the hospital at

about 11:00 p.m. Because Johnson felt appellant was intoxicated at the time of the collision, he placed appellant under arrest at the hospital at about 11:30 p.m. Prior to arresting appellant at the hospital Johnson did not make any requests of appellant to submit to any tests, blood or breath. At the hospital, appellant was transported via wheelchair to Johnson's patrol unit and then taken by Johnson to jail.

At the jail, appellant was taken into the intoxilyzer room by Johnson. Once in this room, Johnson began video taping the processing of appellant for Driving While Intoxicated. At this time, appellant was read his statutory warnings and given his "Miranda" rights. It was at this time that Trooper Johnson first requested appellant submit to a breath test. Appellant refused to take a breath test. At some later time, Trooper Johnson obtained a sample of appellant's blood from the hospital through a grand jury subpoena. This sample was taken to Department of Public Safety laboratory in Houston for testing but the sample was apparently too small and no results were produced. After this attempt, through the issuance of another subpoena, Johnson secured appellant's medical records from the hospital. These records contained the results of blood tests run on samples taken from appellant when he was being treated the evening of the collision. Johnson emphatically denied that the withdrawal of appellant's blood by hospital personnel was at his (Johnson's) request or demand.

At the hearing, appellant testified that he remembered Trooper Johnson approaching him in the hospital while he was being treated for his injuries. Appellant stated that Johnson asked him for a specimen of blood, breath, or urine. Appellant also stated that he agreed to a blood test. Appellant further testified that he did not recall being read any warnings or rights, and that he was arrested after the blood specimen was taken. Appellant indicated that certain events were not clear to him as he had suffered a head injury "from going through the windshield and landing on the hood of my truck."

 A ruling on a motion to suppress lies within the sound discretion of the trial court. *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex.Crim.App.1996). At the hearing on the motion, the trial court serves as the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Id.* (citing *Romero v. State*, 800 S.W.2d 539, 543 (Tex.Crim.App.1990)). As the record of the suppression hearing contained contradictory testimony from two opposing witnesses, we will afford the trial court total deference with regard to its ruling denying the motion to suppress, because assessment of witness credibility and demeanor was a factor for the trial court. *See Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App.1997). In his brief, trial counsel's assessment of the merits of his position *vis-a-vis* the authority he cites is flawed at the outset because he accepts as true appellant's testimony describing the events surrounding the taking of his blood. The trial court was free to completely disregard appellant's version of the events and accept the entirety of Trooper Johnson's testimony. According to Trooper Johnson the hospital's taking of appellant's blood specimen was not done at his request. It was apparently done solely for the purpose of providing appellant medical treatment. Furthermore, the only evidence used at trial which was acquired by Trooper Johnson was the hospital's record of appellant's blood alcohol content secured via a grand jury subpoena.

In *State v. Hardy*, 963 S.W.2d 516 (Tex. Crim.App.1997), the identical issue raised by appellant in points one and two was decided against him. In *Hardy*, the Court held that the State's acquisition of a written hospital report containing blood test results from blood drawn by hospital personnel for medical purposes following a traffic accident did not infringe upon societally-recognized expectation of privacy for Fourth Amendment purposes. *Id.* at 527. As for any alleged violation of Tex. Const. art. I, § 9, the recent case of *Hulit v. State*, 982 S.W.2d 431 (Tex.Crim.App.1998), holds that art. I, § 9 contains no requirement that a seizure or search be authorized by a warrant, and that a seizure or search that is otherwise reasonable will not be found to be in violation of that section because it was not authorized by

a warrant. From the record before us, we have no problem finding the acquisition of appellant's medical records pursuant to a grand jury subpoena to be quite reasonable. Under the issue as framed in points one and two, and in light of the holdings in *Hardy* and *Hulit*, the provisions of TEX.CODE CRIM. PROC. ANN. art. 38.23 (Vernon 1989) are satisfied. As points one and two are without merit, they are overruled.

In his fifth appellate point, appellant complains of the denial of substantive due process and the right of confrontation when he was refused the admittance of relevant blood test results of Clifford Howard in order to show that blood test results were switched. Because appellant provides no authority other than the 14th Amendment for his due process and confrontation complaints we decline to address those issues because of inadequate appellate briefing. *See* TEX.R.APP. P. 38.1(h). We will consider appellant's argument that the trial court's refusal to admit Howard's blood test result violated TEX.R. EVID. 401.[1]

Rule 401 of the Rules of Evidence defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The Rules of Evidence favor the admission of all logically relevant evidence. *Montgomery v. State*, 810 S.W.2d 372, 375 (Tex.Crim.App.1990)(opinion on rehearing). Relevance is not an inherent characteristic of any item of evidence but exists as a relation between an item of evidence and a matter properly provable in the case. *Id.* The trial court has no discretion to admit irrelevant evidence. TEX.R. EVID. 402; *Montgomery*, 810 S.W.2d at 387. As long as the trial court operates within the boundaries of its discretion, we will not disturb its decision. *Id.* at 390.

■■■ In reviewing whether a trial court has abused its discretion, we must determine if the "trial judge's decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree." *Cantu v. State*, 842 S.W.2d 667, 682 (Tex. Crim.App.1992); *Kelly v. State*, 824 S.W.2d 568, 574 (Tex.Crim.App.1992). Thus, we will not disturb the court's decision as long as it lies within the zone of reasonable disagreement. *Green v. State*, 934 S.W.2d 92, 101–02 (Tex.Crim.App.1996) (citing *Montgomery*, 810 S.W.2d at 391). In the instant case, appellant contends that Clifford Howard's blood test results were relevant to show that the hospital somehow switched blood specimens taken from Howard and appellant. Howard's results, which were admitted by the trial court as part of a bill of exception, indicate that his blood alcohol content was .079 while appellant's, as testified to by Dianne Schultz, the medical lab technician at the hospital who analyzed the blood specimens, was .29. Appellant appears to contend that because he elicited testimony that Howard ingested a great deal more alcohol than appellant on the day in question the blood specimens must have been switched at the hospital. However, appellant's questioning of Alice Aills, the hospital phlebotomist who took the specimens from both appellant and Howard, did not attempt to raise an issue regarding a mistake or switch of blood samples. Appellant's questioning of Ms. Aills does not even attempt to call into question her handling of the specimens or attempt to raise a chain of custody issue. We reiterate the observation that relevance is not an inherent characteristic of any item of evidence but exists as a relation between an item of evidence and a matter properly provable in the case. The point at which appellant tendered Howard's blood test results for admission into evidence appellant had not yet attempted to raise, through the hospital witnesses, a mishandling of the blood specimens. It appears reasonable to us that the trial court might have wanted to hear evidence from the phlebotomist and the lab technician attempting to call into question their handling of the specimens. Because the trial court's decision was "within the zone of reasonable disagreement" we decline

---

1. Former Rule of Criminal Evidence 401, which was in effect at the time of trial, is identical to Rule of Evidence 401.

to disturb it. Appellate point five is overruled.

Appellant's final issue contends that he was unfairly deprived of indigent status on his appeal when he was not provided with a reporter's record free of charge after proving indigency status. However, a reporter's record was filed with this Court which we have before us. The issue is moot as appellant has caused a reporter's record to be filed in this cause. *See Reyna v. State*, 797 S.W.2d 189, 194 (Tex. App.—Corpus Christi 1990, no pet.); *Jannise v. State*, 789 S.W.2d 623, 630 (Tex.App.—Beaumont 1990, pet. ref'd). Point six is overruled. The judgments and sentences as to counts one and three are affirmed; the judgment as to count two is reversed and that count remanded to the trial court for entry of an order of acquittal on count two.

AFFIRMED IN PART; REVERSED AND REMANDED FOR ENTRY OF ACQUITTAL ORDER IN PART.