# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

### NO. 03-12-00133-CR

**Billy Gene Faircloth, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 167TH JUDICIAL DISTRICT
NO. D-1-DC-11-200824, HONORABLE MICHAEL LYNCH, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant, Billy Gene Faircloth, of aggravated assault with a deadly weapon and sentenced him to sixty years in prison. *See* Tex. Penal Code §§ 12.32 (first-degree felony punishment); .42 (enhancements for habitual offenders); 22.02 (aggravated assault). In two issues on appeal, appellant asserts that the evidence was insufficient to support the jury's finding that he was the perpetrator of the crime and that a rock used to beat the victim was a deadly weapon. *See id.* § 1.07 (definition of "deadly weapon"). We will affirm the judgment of conviction.

## BACKGROUND

The jury heard evidence of the following: In mid-February 2011, Kathy McWilliams was attacked from behind by a male assailant after exiting her vehicle, which was parked on the lowest level of a five-story underground parking garage in downtown Austin. The assailant repeatedly struck McWilliams in the back, side, and front of her head with a hard object, which she

did not see but perceived to be something like a brick. Although bleeding profusely, McWilliams was able to physically repel the assailant, and he ran away after two bystanders—a man and a woman—happened on the scene and responded to McWilliams's cries for help.

Although McWilliams could not see distances clearly without her glasses, which had been knocked off in the assault, she kept her eye on the assailant as he fled and hid in the garage. The female bystander also saw the assailant flee to the same area of the parking garage. When a uniformed maintenance worker and security guard arrived at the scene, McWilliams pointed them to where she could still see her attacker hiding, which was approximately 20 to 30 feet away from her. The maintenance worker and security guard approached the man, who appeared to be hiding, and directed him to "stop" or "give it up" or both. The man did not respond to the directive and instead ran. The maintenance worker pursued him. Another building employee and security guard assisted in the pursuit, which traversed several levels of the parking garage. Two levels up, a man in a yellow shirt and jeans was found standing or hiding behind a car and was tackled by a security guard when he attempted to flee. The man, subsequently identified as appellant, was arrested by an Austin Police Department (APD) officer, who arrived on the scene shortly before or after appellant was apprehended. The officer testified that appellant was sweating profusely, "consistent with somebody . . . who had been running around a parking garage for 10 or 15 minutes."

Prior to or contemporaneously with the initiation of pursuit, the female bystander had given a security guard a description of the assailant as a man wearing a yellow shirt and jeans. The man found in the vicinity of the attack was said to be wearing a yellow shirt and what a security guard described as dark beige trousers. Although the security guard and maintenance worker did not

2

have a description of the assailant, the man was pursued based on McWilliams's statement directing them to the man's location and his subsequent attempt to flee when approached and confronted.

At some point during or after the pursuit, the maintenance worker found an "unusual" rock in a stairwell near where McWilliams saw her attacker hiding and in the vicinity of where the man had been when fleeing the security guard. The maintenance worker testified that the rock was unusual because it was atypical of the materials used in the building and parking garage. The rock, which a witness described as being a smooth river rock that was a little bigger than a softball, was later determined to be stained with McWilliams's blood. McWilliams's blood was also found on a package of cigarettes found at the scene near her purse. The cigarettes did not belong to McWilliams, and appellant could not be excluded as a contributor to a DNA mixture found on the package. At trial, a DNA analyst for APD testified that the probability of the DNA matching an unrelated person at random was 1 in 33,260 for Caucasians. Appellant also could not be excluded as a contributor to a DNA mixture that was found on the rock, although the DNA analyst testified that as to that sample the statistical probability of a match to appellant was much lower at 1 in 217 for Caucasians. In addition, it was undisputed that the rock was transported to the APD lab inside appellant's boot, creating a possibility of contamination.

At trial, McWilliams testified that her assailant had bright blue eyes, curly hair, tan or khaki pants, and a yellow short-sleeved golf-type shirt. It was stipulated that the appellant has blue eyes. The female bystander testified that the assailant had dark hair and light skin and was wearing dark pants and a light-colored, double-breasted shirt or top with long sleeves that looked like a chef's shirt (or something with a collar high up on the neck like a Mandarin-type collar). The

3

male bystander testified that he did not get a good look at the assailant because the garage was dark and he was attending to McWilliams but that after the assault he had reported that the assailant was wearing a dirty or brownish long-sleeve shirt or smock, like a chef might wear. The security guard who pursued the man hidden in the location identified by McWilliams described the man as being middle-aged with a goatee, dark-colored beige slacks and a light yellow canary-colored shirt. At trial, he identified appellant as the man who was found hiding and who attempted to evade capture when confronted. Other than the security guard and one of the maintenance workers who pursued appellant, no witness described McWilliams's attacker as having facial hair, and McWilliams had told police the assailant was "clean shaven." At trial, she explained that by "clean shaven" she meant that "he was not a street person. He wasn't a street urchin. . . . [H]e was clean cut."

The jury also heard evidence that all exits and entrances to the parking garage were found at street level, and once inside the garage, people could only move between levels via the garage's ramps, elevators that open to the lobby, or two stairwells leading either to the building's lobby or an alley. All entrances and exits to the garage were monitored with surveillance cameras. Although there was no video-surveillance footage of the actual assault on McWilliams, the jury viewed video footage of appellant's movements prior to the attack. The footage also shows the pursuit of appellant, and witnesses positively identified him as the man shown attempting to evade capture after being confronted following the attack. Although appellant was not employed in the building, the video showed that he arrived in the parking garage at approximately 8:00 a.m. that morning and did not leave the garage at any time prior to being arrested at about 1:15 p.m. in the afternoon. He was also shown wandering on various levels of the parking garage and was seen

4

"talking" on a cell phone on floors of the parking garage that witnesses uniformly testified lack cell phone service. The jury also viewed surveillance video and still images that show appellant running in the vicinity of the assault shortly after McWilliams was attacked and up the ramp to level 4 of the garage. No other person was captured on the video-surveillance footage running or wandering around the parking garage in the vicinity of the attack at the time of the attack or during the subsequent pursuit of the individual witnesses identified as being appellant. Video-surveillance footage also did not show appellant or anyone else leaving the building near the time of the attack. A security guard who viewed the video-surveillance footage of that day said he was looking only for video footage of appellant, but he did not see any other "random people" loitering in the parking garage or anything else that raised his suspicions. He also did not see anyone wearing a chef-style jacket or any suspicious person having long sleeves, nor was such a person ever found in the garage. Photographs of appellant after he was apprehended were admitted at trial and show him to be wearing blue jeans and a light yellow button-collared, front-button shirt with short sleeves. He had dark hair that was thick and slightly wavy, light skin, a mustache, and a goatee.

The jury found appellant guilty of aggravated assault with a deadly weapon and, after finding that he had committed at least one prior felony offense, sentenced him to 60 years in prison.

## DISCUSSION

In his first appellate issue, appellant contends that there is insufficient evidence to support the jury's finding that he was McWilliams's assailant. He points out that no eyewitness ever positively identified him as the assailant. In addition, the three eyewitnesses—McWilliams and the two bystanders—gave inconsistent descriptions of the assailant's attire and made no mention of

5

facial hair in their descriptions. Moreover, the two bystanders both testified that McWilliams's assailant wore a long sleeve, chef-style jacket, but appellant did not have one in his possession when he was apprehended, and video-surveillance footage does not show him to be wearing or carrying a chef's jacket or a long-sleeve shirt when he entered the garage. Appellant also asserts that the only physical evidence linking him to the crime is not compelling and further notes that McWilliams's blood was not found on him or his clothing.

When reviewing the sufficiency of the evidence to support a conviction, we consider all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Byrd v. State*, 336 S.W.3d 242, 246 (Tex. Crim. App. 2011); *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *see also Merritt v. State*, 368 S.W.3d 516, 525 n.8 (Tex. Crim. App. 2012). An essential element that the State must establish beyond a reasonable doubt is that the accused was the perpetrator of the crime charged. *See Wilson v. State*, 9 S.W.3d 852, 855 (Tex. App.—Austin 2000, no pet.) (citing *Johnson v. State*, 673 S.W.2d 190, 196 (Tex. Crim. App. 1984)). Evidence as to the identity of the perpetrator of an offense can be established by direct or circumstantial evidence; eyewitness identification is not necessary. *Earls v. State*, 707 S.W.2d 82, 85 (Tex. Crim. App. 1986); *Greene v. State*, 124 S.W.3d 789, 792 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). For purposes of proving guilt beyond a reasonable doubt, direct and circumstantial evidence of identity are equally probative. *Wilson*, 9 S.W.3d at 855 (citing *McGee v. State*, 774 S.W.2d 229, 238 (Tex. Crim. App. 1989)). Furthermore, any discrepancies in the description of an assailant's clothing or appearance go to the

6

credibility of the witnesses and the weight to be given their testimony, which are matters solely for the fact-finder's consideration. *See Merritt*, 368 S.W.3d at 525 (fact-finder is sole judge of weight of evidence and credibility of witnesses); *Earls*, 707 S.W.2d at 85 (jury to resolve discrepancies in witnesses' descriptions of perpetrator).

It is not necessary that every fact point directly and independently to the defendant's guilt; it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *Merritt*, 368 S.W.3d at 526; *Williams v. State*, 240 S.W.3d 293, 297 (Tex. App.—Austin 2007, no pet.). In this case, circumstantial evidence points strongly to appellant as the man who attacked McWilliams. There was evidence that appellant was present in the parking garage for a substantial portion of the day in areas of the parking garage reserved for employees; however, he was not employed in the building. He was purporting to use his cell phone for extended periods of time in areas where there was no cell phone service. Several witnesses place a man generally matching appellant's description in temporal and physical proximity to the scene of the crime. When confronted, a man identified by witnesses as being appellant attempted to evade pursuers and conceal himself after being confronted. This pursuit was captured on video-surveillance footage, which the jury viewed. Although the attack on McWilliams was not captured on video, a man identified as appellant was captured on video running from the scene of the attack contemporaneously with the general timeline of the attack, and no other unidentified person was videotaped or found in the vicinity of the assault. After being pursued from level 5 to level 3 of the parking garage, appellant had to be physically subdued and, when arrested, was sweating profusely, consistent with having run up several levels of the parking garage. Although

7

opportunity to commit the crime and flight to avoid capture may not be sufficient on their own to prove identity, they are circumstances indicative of guilt. *See Merritt*, 368 S.W.3d at 526 (jury can consider motive and opportunity as circumstantial evidence of guilt); *Clay v. State*, 240 S.W.3d 895, 905 n.11 (Tex. Crim. App. 2007) (evidence of flight evinces consciousness of guilt); *Hemphill v. State*, 505 S.W.2d 560, 562-63 (Tex. Crim. App. 1974) (evidence of flight and concealment are circumstances that may be considered with other evidence); *Cawley v. State*, 310 S.W.2d 340, 342 (Tex. Crim. App. 1957) (evidence of flight is corroborating circumstance because it is indicative of consciousness of guilt). Finally, physical evidence links appellant's DNA to a cigarette package found at the crime scene that had the victim's blood on it. The jury could have considered this evidence along with all the other circumstantial evidence pointing to appellant's identity as the perpetrator.

Giving proper deference to the jury's verdict and the combined force of all the evidence, we conclude that a rational trier of fact could have found beyond a reasonable doubt that appellant was the perpetrator of the assault on McWilliams. *See Merritt*, 368 S.W.3d at 525 (reversing court of appeals because court "failed to properly consider the combined and cumulative force of the evidence and to view the evidence in the light most favorable to the jury's guilty verdict"). We therefore overrule appellant's first appellate issue.

In his second appellate issue, appellant challenges the sufficiency of the evidence to support the jury's finding that he used a deadly weapon in the course of assaulting McWilliams. To sustain a deadly weapon finding, there must be sufficient evidence that: (1) the object meets the statutory definition of a "deadly weapon"; (2) the deadly weapon was used and exhibited "during the

8

transaction from which" the felony conviction was obtained; and (3) other people were endangered. *Drichas v. State*, 175 S.W.3d 795, 798 (Tex. Crim. App. 2005). The Penal Code defines the term "deadly weapon" to include "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." Penal Code § 1.07(a)(17)(B). Under this definition, "[o]bjects that are not usually considered dangerous weapons may become so, depending on the manner in which they are used during the commission of an offense." *Drichas*, 175 S.W.3d at 798. There is no dispute that the rock was used to assault McWilliams and that she was thereby endangered. The only issue on appeal is whether the rock meets the statutory definition of a "deadly weapon."

In *McCain v. State*, the court of criminal appeals explained section 1.07(a)(17)(B) by saying:

> The statute does not say "anything that in the manner of its use or intended use causes death or serious bodily injury." Instead the statute provides that a deadly weapon is "anything that in the manner of its use or intended use *is capable of causing* death or serious bodily injury." The provision's plain language does not require that the actor actually intend death or serious bodily injury; an object is a deadly weapon if the actor intends a use of the object in which it would be capable of causing death or serious bodily injury. The placement of the word "capable" in the provision enables the statute to cover conduct that threatens deadly force, even if the actor has no intention of actually using deadly force.

22 S.W.3d 497, 503 (Tex. Crim. App. 2000) (internal citations omitted). Several factors may be considered in determining whether an object is capable of causing death or serious bodily injury: (1) physical proximity between the victim and the object; (2) the threats or words used by the defendant; (3) the size and shape of the weapon; (4) the weapon's ability to inflict death or serious

9

injury; (5) the manner in which the defendant used the weapon; and (6) the nature of the wounds inflicted. *See, e.g.*, *Dominique v. State*, 598 S.W.2d 285, 286 (Tex. Crim. App. 1980); *Kennedy v. State*, ___ S.W.3d ___, No. 02-11-00417-CR, 2013 WL 709102, at *4 (Tex. App.—Fort Worth 2013, no pet. h.); *Romero v. State*, 331 S.W.3d 82, 83 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd); *Bailey v. State*, 46 S.W.3d 487, 491-92 (Tex. App.—Corpus Christi 2001, pet. ref'd); *Lozano v. State*, 860 S.W.2d 152, 156 (Tex. App.—Austin 1993, pet. ref'd); *see also Brown v. State*, 716 S.W.2d 939, 946-47 (Tex. Crim. App. 1986) (noting that court of appeals considered such factors and upholding court's conclusion that evidence was legally sufficient to sustain conviction). No one factor is determinative, and each case must be examined on its own facts. *See Brown*, 716 S.W.2d at 946-47. Viewing the evidence in light of the foregoing factors, the record contains sufficient evidence to support the jury's deadly-weapon finding.

The evidence shows that McWilliams sustained multiple blows to the head from a rock larger than a softball. Although appellant observes that no witness testified about the weight of the rock, the rock was admitted at trial for the jury's consideration. The rock is large and dense with mostly smooth, rounded edges but it also has some jagged or uneven pieces. McWilliams was attacked from behind, reducing the opportunity to defend against the attack and indicating that the location of the blows to the head was intentional. Although there is no direct testimony about the proximity of the victim and the assailant, the jury could rationally infer close proximity from the nature of the weapon (which either must have been thrown or used in close proximity), the repeated number of blows to the head (tending to negate it having been thrown), and McWilliams's testimony that (1) she saw the assailant's shadow approach her from behind with something in his hand, (2) the

10

man continued striking her in the head when she turned toward him, and (3) he was close enough for her to kick him in the groin and shove him away from her. The jury could also have inferred that the rock, in the manner used, was *capable* of inflicting death or serious injury based on evidence about the location and severity of the injuries McWilliams sustained. Several witnesses testified that the victim and her clothing were saturated with McWilliams's blood and that there was a lot of blood at the scene. Furthermore, after the attack, McWilliams was treated at a hospital for at least three lacerations to the head, including a severe one that required staples to close it. An APD officer who took photos of McWilliams's injuries testified that she had a "pretty deep laceration" behind the ear and that some of her skin had been dislodged and had become stuck in her hair. Such wounds, received in a vulnerable part of the body, logically carry at least some potential for resulting in a serious bodily injury, including brain damage or death. Moreover, the jury could have inferred from the manner in which McWilliams was assaulted that she would have been hurt even more severely if she had not defended herself. Indeed, McWilliams herself testified that she thought that the rock could have been used to kill her if she had not fought back.

In arguing that the evidence is insufficient for the jury to have found that the rock was capable of causing death or serious bodily injury, appellant relies on *Webb v. State*, in which the court of criminal appeals concluded that the evidence was insufficient to sustain a finding that a victim struck in the head with a rock suffered a "serious bodily injury." 801 S.W.2d 529, 530 (Tex. Crim. App. 1990). Appellant's reliance on *Webb* is misplaced, however, because the issue there was whether the victim *actually* sustained a serious bodily injury, which is not the issue in this case. A deadly weapon finding does not require that the object *actually* cause death or serious bodily injury

11

or that the defendant caused or intended to cause death or serious bodily injury; it only requires that the object have more than a hypothetical *capability* of causing death or serious bodily injury and that the actual or intended *use* of the object was *capable* of causing death or serious bodily injury. *Johnston v. State*, 150 S.W.3d 630, 638 (Tex. App.—Austin 2004, no pet.); *Johnston v. State*, 115 S.W.3d 761, 764 (Tex. App.—Austin 2003), *aff'd*, 145 S.W.3d 215 (Tex. Crim. App. 2004). Considering the close proximity between appellant and McWilliams, the violent manner in which he assaulted her, the photos and description of the wounds, the size and density of the object used to hit her, and McWilliams's testimony that the rock could have been used to kill her, we conclude that a rational fact-finder could have found that appellant used or intended to use the rock in such a manner that it would be capable of causing serious bodily injury or death. We overrule appellant's second appellate issue.

## CONCLUSION

Having overruled both of appellant's appellate issues, we affirm the judgment of conviction.

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Goodwin and Field

Affirmed

Filed: May 30, 2013

Do Not Publish