Norman SAXER, Appellant,

v.

The STATE of Texas, Appellee.

No. 09–01–499–CR.

Court of Appeals of Texas, Beaumont.

Submitted Feb. 24, 2003.

Decided Aug. 29, 2003.

John D. MacDonald II, Conroe, for appellant.

Michael A. McDougal, District Attorney, Jim Prewitt, Marcia Tillman, Gail Kikawa McConnell, Assistant District Attorneys, Conroe, for state.

Before STEVE McKEITHEN, C.J., DON BURGESS and GAULTNEY, JJ.

## OPINION

STEVE McKEITHEN, Chief Justice.

A jury convicted Norman Saxer of murder and assessed his punishment at fifty years' confinement in the Texas Department of Criminal Justice—Institutional Division. Saxer raises seven issues for our consideration. His first two issues complain of the lack of legally and factually sufficient evidence to sustain his conviction. Issues three through five complain of trial court error in permitting extraneous offense/bad act evidence to be admitted before the jury. Issues six and seven refer to the trial court's refusal to permit Saxer to impeach a State's witness. We begin, as we must, with an analysis of Saxer's legal sufficiency complaint.

At the outset, we note that the State's case against Saxer was entirely circumstantial. In *Dorsey v. State*, 24 S.W.3d 921 (Tex.App.-Beaumont 2000, no pet.), a case also heavily reliant on circumstantial evidence to sustain the conviction, we framed the standard for reviewing a legal sufficiency complaint as follows:

In evaluating legal sufficiency, we must view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

. . . .

[A]ll evidence admitted at trial—including improperly admitted evidence—is considered in a legal sufficiency review. *Dewberry v. State,* 4 S.W.3d 735, 740–41 (Tex.Crim.App.1999), *cert. denied,* 529 U.S. 1131, 120 S.Ct. 2008, 146 L.Ed.2d 958 (2000).

. . . .

... In our sufficiency review, we are governed by the fact that the jury is the exclusive judge of the facts proved, the credibility of the witnesses, and the weight to be given to the testimony. TEX.CODE CRIM. PROC. ANN. Art. 38.04 (Vernon 1979). The jury may believe or disbelieve all or any part of a witness's testimony, even though the witness's testimony has been contradicted. *Sharp v. State,* 707 S.W.2d 611, 614 (Tex.Crim. App.1986). Reconciliation of conflicts in the evidence is within the exclusive providence of the jury. *Jones v. State,* 944 S.W.2d 642, 647 (Tex.Crim.App. 1996). Where, as here, identity is an issue in the case, the identity of the perpetrator may be proved by direct or circumstantial evidence. *See Earls v. State,* 707 S.W.2d 82, 85 (Tex.Crim.App. 1986).

*Dorsey,* 24 S.W.3d at 924. Additionally, we recognize that the standard by which a reviewing court considers a legal sufficiency complaint is the same when faced with a record containing direct or circumstantial evidence. *Id.* We also note that in applying the *Jackson v. Virginia* standard for legal sufficiency, reviewing courts in Texas consider only the evidence that supports the verdict and ultimately disregard any evidence that does not support the verdict. *See Clewis v. State,* 922 S.W.2d 126, 132 n. 10 (Tex.Crim.App.1996). Based upon these appellate standards, we set out the pertinent facts contained in the record before us and disregard facts or inferences that do not support the verdict.

## LEGAL SUFFICIENCY REVIEW

At approximately 5:00 p.m., on June 1, 2000, the body of the victim, Emily Thorson, was discovered by her boy friend, Paul Morales. Morales had just returned from work and had noticed that the door leading into the apartment he shared with Thorson was unlocked. Thorson's body was fully clothed down to the slip-on sandals on her feet. She was partially on and partially off the couch with her upper torso and head laying on the seat-cushions of the couch. Thorson had a towel on or around her head and the towel had blood on it. There also appeared to be blood on the back and arm of the couch on the left side. A subsequent autopsy determined Thorson had been shot twice in the head at close range. The cause of death was due to the gunshot wounds to the head with a "secondary diagnosis" of strangulation due to evidence of external neck compression. Also, based on the condition of the body when the autopsy took place, and on the time the autopsy was performed, it was estimated that Thorson was killed between the hours of 11:00 p.m. of May 31, and 11:00 a.m. of June 1.

Saxer lived in the same apartment complex as Morales and the victim. It appears from the record that Saxer had known the victim for quite some time and the victim had been a babysitter for Saxer and his wife approximately four years earlier. The record further indicates that besides socializing with Saxer and his wife, Morales and the victim also purchased marijuana from, and shared marijuana with, Saxer. Morales and the victim also owed Saxer money for marijuana.

Approximately one week before Ms. Thorson's murder, Mr. Morales, Ms. Thorson, and Mr. Morales's step-father helped Saxer's wife, Susan, move out of the apartment she shared with Saxer. Saxer was

unaware that his wife intended to move out and only found out when he returned to the apartment from work. Upon finding his wife gone, Saxer went to the apartment of the manager, Lisa Garcia, and spoke to her concerning his wife's whereabouts. Garcia could see that appellant was a little upset, and although Garcia knew where Saxer's wife was, she told Saxer that she did not. Over objection, Garcia was permitted to testify that Saxer stated the following, "if he [Saxer] found out who helped her [Saxer's wife] move out, he was going to kill them."

The police investigation of the murder scene turned up no usable fingerprint evidence nor any other physical evidence such as hair, nail clippings, skin, or body-fluids that could be connected to Saxer. However, a spent bullet was located approximately ten feet from the couch where the victim's body was found. This bullet matched the .22 caliber handgun that was later identified by two witnesses, John Sayers and Lisa Garcia, as having been sold back to Saxer in the early-morning hours of June 1, 2000. Sayers had purchased the handgun from Saxer approximately two months before the murder took place. At approximately 12:45 p.m., on June 1, 2000, Sayers returned to Saxer's apartment to retrieve a bottle of whisky when he saw the handgun again. Sayers saw the handgun on Saxer's waterbed in Saxer's upstairs bedroom. Saxer told Sayers that he was going to a shooting range to shoot "some guns."

Another Saxer friend, Patrick Lee Sparks, testified to his encounters with Saxer on the day of the murder. The testimony from Sparks that was most significant indicated that at about 10:55 a.m. or 11:00 a.m., on June 1, 2000, Sparks received a call from Saxer asking Sparks not to come to Saxer's apartment as Saxer had a "lady friend" coming over. Previous testimony indicated that Sparks had been at Saxer's apartment from about 8:00 a.m. to about 10:30 a.m. on June 1. Over objection, Sparks was permitted to testify that early on the morning of June 1, Saxer called Sparks requesting to purchase some methamphetamine from Sparks. Sparks brought the methamphetamine to Saxer's apartment at about 8:00 a.m., and he and Saxer ingested the drug sometime thereafter. At any rate, Sparks later related that he received a follow-up call from Saxer at about 11:20 a.m., indicating that Saxer was "done with what he was doing with his lady friend" and indicated that Sparks could return to Saxer's apartment. Sparks then returned to Saxer's apartment. It was at this time that Sparks and Saxer discussed going shooting in Huntsville later in the day. Sparks then left Saxer's apartment to go visit another friend living at the same complex. Sparks visited this friend from approximately noon to about 12:30 p.m. or 12:45 p.m., at which time Sparks returned to Saxer's apartment.

At this point, Sparks testified that Saxer had some bags packed with several "guns" that the two men would use to shoot in Huntsville, and that Saxer was polishing the .22 caliber handgun. Sparks testified that Saxer indicated that the handgun had been brought over by a friend from work and that this friend "may have gotten in some trouble with it." Saxer brought the .22 caliber handgun with them to Huntsville, and after Sparks shot the handgun, Saxer told Sparks that he [Saxer] had to get rid of the handgun "because he didn't want it over there just in case the police came looking for it." Sparks was given the handgun and subsequently purchased it. On the return trip from Huntsville the men dropped the .22 caliber handgun off at Sparks's house. Sparks testified that he later learned that Ms. Thorson had been murdered by being shot in the head. At

some point after this, Sparks received a call from Saxer. Sparks asked Saxer if he was aware that Ms. Thorson had been shot, and told Saxer that he [Sparks] was going to return the .22 caliber handgun to Saxer. Sparks described Saxer's demeanor as going from "pretty normal" to "hostile," with Saxer telling Sparks not to bring the handgun back to Saxer's apartment. Saxer told Sparks that he [Saxer] was going to pick up his kids and his wife and then hung up the phone.

Fearing the handgun to be possibly connected to Ms. Thorson's murder, Sparks drove to a location, Artesian Lakes, and threw the handgun in the lake. The handgun was ultimately retrieved from the lake by authorities during the investigation of Ms. Thorson's murder. Sparks also testified to two other incidents involving Saxer that occurred on June 1. First, while he and Saxer were driving along Interstate 45 on their way to Huntsville to shoot the guns, Saxer pulled a bag of clothes from behind the driver's seat and began throwing articles of clothing out of the window at certain intervals. Sparks remembered the general description of the clothes. The second incident took place later in the evening after Sparks had disposed of the handgun and he and some friends had gone to "Mustards," a bar and grill. Sparks received a call from Saxer and Sparks went back to Saxer's apartment. Sparks described the circumstances in the following way:

Q.[State] And did you get a call from the defendant Norman Saxer?

A.[Sparks] Yes, I did. It was right as I was coming back from Mustards. Me and Dusty and Ciera were pulling up, and I got another phone call again from Norman; and he seemed to act normal, like, a lot more calmed down than he was whenever we last talked, in other words. And then, so I went over there

and he was pretty much pacing the kitchen back and forth. And then he said the cops had just roughed him up, and he lifted up his shirt and showed some scratch marks and said the cops had roughed him up.

Q. Okay. Did you stay or did you decide to leave?

A. Well, I started to leave.

Q. And what happened when you started to leave?

A. He kind of ran over to the door and got hostile with me again and said, "Don't you leave." And then that's whenever he whispered in my ear and he said, "It's messed up. I F'd her today."

Q. He said what?

A. "I F'd her today."

Q. At that point in time, did you leave?

A. Yes, I did.

Two other witnesses contributed testimony in the State's case. The first was from Mario Henson, who was the maintenance man at Saxer's apartment complex. Mr. Henson had worked at the apartment complex for some thirteen years and was familiar with both Saxer and the victim. At about 11:35 a.m., on June 1, 2000, Mr. Henson observed Saxer and the victim "walking real close, side by side" down the sidewalk of the complex "and they cut through the breezeway going back that way, I guess, toward her apartment, I believe." Henson further testified that it appeared that Saxer and the victim were talking but he could not hear anything as he was too far away. The second witness contributing further testimony to the State's case was Melissa Lewis McNeely, a representative of the Church of Jesus Christ of Latter-day Saints. On June 1, 2000, Ms. McNeely was at Saxer's apartment complex visiting church members. Shortly after 1:00 p.m., as she walked

through the complex, Ms. McNeely saw Saxer standing on the porch outside his apartment. Ms. McNeely recognized Saxer as he was a member of her church. At this point, Ms. McNeely and Saxer engaged in a brief conversation, described by McNeely as follows:

Q.[State] What did you say to him?

A.[McNeely] It was just a basic conversation of how he was doing.

Q. Okay. And did he respond?

A. Yes, he did. He told us that he had just gotten home from a doctor's appointment. And he mentioned to us that if he hadn't been at the doctor's appointment, he would have been in the state pen.

As the State notes in its brief, Saxer did go on to explain to Ms. McNeely that he was a correctional officer and worked at the "state pen."

■ A review for legal sufficiency under *Jackson v. Virginia* is an analytical tool used to determine whether there is a fact issue at all. *Clewis,* 922 S.W.2d at 133. So long as the direct and/or circumstantial evidence elicited at trial would permit *any* rational trier of fact to find each of the elements of the crime proven beyond a reasonable doubt, a defendant so convicted has no recourse under *Jackson v. Virginia* because the testimony in such a case, however incredible, is legally sufficient evidence. *Id.* at 133 n. 12. In the instant case, we certainly recognize that certain key fact-witnesses called by the State—Mr. Sparks, Ms. Garcia, and Mr. Sayers—had their credibility severely impeached in ways which will be examined later in this opinion. Nevertheless, we are required to disregard any physical evi-

dence or testimony not favorable to the verdict and look only to that physical evidence and testimony that is favorable. *See also Goodman v. State,* 66 S.W.3d 283, 285–86 (Tex.Crim.App.2001)(legal sufficiency and the Cretan Liar). Therefore, considering all of the evidence in the record in the light most favorable to the verdict, we find that a rational trier of fact could have found Saxer guilty of the murder of Emily Thorson beyond a reasonable doubt. Issue One is overruled.

## FACTUAL SUFFICIENCY

■ When called upon to conduct a factual sufficiency review, the appellate court asks whether a neutral review of all the evidence, both for and against the finding, demonstrates that the proof of guilt is so obviously weak as to undermine confidence in the jury's determination, or the proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof. *King v. State,* 29 S.W.3d 556, 563 (Tex. Crim.App.2000) (citing *Johnson v. State,* 23 S.W.3d 1, 11 (Tex.Crim.App.2000)) (Court of Criminal Appeals adopts the complete civil factual sufficiency formulation).

■ Saxer summarizes his argument under this issue thusly: "The greater weight of the evidence failed to prove that the appellant caused the death of Emily Thorson." Therefore, we are presented with the type of evidentiary review characterized by the Court of Criminal Appeals as "balancing scale." *See Goodman v. State,* 66 S.W.3d 283, 285 (Tex.Crim.App. 2001). In *Goodman,* the Court analogized the "balancing scale" review with the whimsical "Cretan Liar" scenario.[1] In

---

1. We will not here recite the entire "Cretan Liar" parable set out in *Goodman.* Judge Cochran's "Cretan Liar" appears to have made his initial appearance in her excellent

law review article on relevancy. *See* Cathleen C. Herasimchuk, *The Relevancy Revolution In Criminal Law: A Practical Tour Through The Texas Rules Of Criminal Evidence,* 20 ST.

short, it would appear that a proper factual sufficiency review encompasses a *quantitative* analysis of all the evidence (total amount of evidence presented by each party on a particular fact at issue), as well as a *qualitative* analysis of all the evidence. *See id.* at 285–86, and accompanying footnotes. Additionally, as part of this qualitative analysis, the appellate court is to apparently make an independent assessment of any objective indicators of credibility for each fact-witness called to testify. *Id.* As the Court noted, "[T]he next practical issue is how many boy scouts does it take to make a verdict based on the testimony [of] a multiple perjurer 'clearly wrong' and 'manifestly unjust?' . . . At some point, the reviewing court necessarily exercises its subjective judgment." *Id.* at 286 n. 5.

We have very carefully reviewed all of the record evidence. We conclude that this is not the case for us to exercise our subjective judgment. As we noted at the outset of this opinion, the case for the prosecution was entirely circumstantial. Virtually every key fact witness for either the State or Saxer had his or her credibility impeached by various means. It was entirely for the jury to determine which witness was credible or not credible and what portions of testimony, if any, to give any weight to.

 Because the jury is the sole judge of the facts, we must give deference to its findings. *Cain v. State,* 958 S.W.2d 404, 407 (Tex.Crim.App.1997). What weight to give to contradictory testimonial evidence is within the sole province of the jury, because it turns on an evaluation of credibility and demeanor. *Id.* at 408–09. Even under a factual sufficiency review, we are not free to re-weigh the evidence and set aside the jury's verdict merely

because we may feel that a different result is more reasonable. *Id.* at 407. We cannot reverse the verdict if reasonable minds could differ about the conclusions to be drawn from the evidence. *Richardson v. State,* 973 S.W.2d 384, 387 (Tex.App.-Dallas 1998, no pet.). We may find the evidence factually insufficient only where necessary to prevent manifest injustice. *Cain,* 958 S.W.2d at 407. A decision is not manifestly unjust merely because the jury resolved conflicting views in favor of the State. *Id.* at 410. Additionally, a decision is not manifestly unjust merely because the defense has presented a reasonable alternative hypothesis. *See Ates v. State,* 21 S.W.3d 384, 391 (Tex.App.-Tyler 2000, no pet.); *Richardson,* 973 S.W.2d at 387. Under a very close reading of the entire record before us, we cannot say that proof of guilt is obviously so weak as to undermine our confidence in the jury's verdict, nor can we say that the proof of Saxer's guilt, taken alone, is greatly outweighed by contrary proof. We, therefore, overrule Issue Two.

## EXTRANEOUS OFFENSES

Issues Three through Five complain of the admission of various extraneous bad act/offense evidence tendered by the State under different theories of admissibility, such as "state of mind," "motive," and "previous relationship." We examine these issues by revisiting the seminal, treatise-like case of *Montgomery v. State,* 810 S.W.2d 372 (Tex.Crim.App.1991)(opinion on rehearing), and its progeny.

 Initially, we wish to clarify our position on the admissibility of certain extraneous bad act/offense evidence under Tex.Code Crim. Proc. Ann. art. 38.36 (Ver-

Mary's L.J. 737, 745–46 n. 21 (1989). The fellow certainly gets around the hallowed

halls of Texas jurisprudence.

non Supp.2003). Article 38.36(a) reads as follows:

> In all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense.

In *Smith v. State*, 5 S.W.3d 673, 679 (Tex. Crim.App.1999), the Court held that evidence admissible under art. 38.36(a) may be excluded under Tex.R. Evid. 404(b) and 403. Specifically, the Court stated that if a defendant makes a timely 404(b) or 403 objection, before the trial court can properly admit the evidence under art. 38.36(a), it must first find the non-character conformity purpose for which it is proffered is relevant to a material issue. *Id.* If the proffered evidence is relevant to a material issue, the trial court must then determine whether the evidence should nevertheless be excluded because its probative value is substantially outweighed by the factors in Rule 403. *Id.* Therefore, for our purposes, any extraneous bad act/offense evidence tendered by the State as admissible under art. 38.36(a) must first pass admissibility standards set out by Texas Rules of Evidence 404(b) or 403, if properly and timely objected to.

 Rule 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tex.R. Evid. 401. Rule 404(b) provided, in part: "Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Tex.R. Evid. 404(b); *Montgomery*, 810 S.W.2d at 386–87. If extraneous act/offense evidence is not relevant apart from supporting an inference of character conformity, it is inadmissible under rule 404(b). *Montgomery*, 810 S.W.2d at 387. After the opponent objects to the evidence under Rule 404(b), the proponent has the burden to satisfy the trial court that the evidence is relevant beyond character conformity. *Id.* Evidence is relevant where it logically serves to make more or less probable an elemental fact, an evidentiary fact that inferentially leads to an elemental fact, or defensive evidence that undermines an elemental fact. *Id.*

Issue Three complains of the admission of extraneous act/offense testimony through the State's witness, Paul Morales. Morales was the boyfriend of the victim. The specific testimony complained of by Saxer is described as follows:

> (1) That Morales and Thorson had provided some marijuana to the appellant [Saxer] and that he [Saxer] was mad at them for taking some of it.
>
> (2) That Morales and Thorson owed the appellant [Saxer] money for some drugs that he [Saxer] had provided them.
>
> (3) That Thorson was afraid of the appellant [Saxer] because she had helped the appellant's [Saxer's] wife move out of their apartment.

With regard to the first portion of testimony, the trial court refused to allow any evidence that Saxer was mad or upset at Thorson and Morales because of any problem with the marijuana transaction. The trial court did permit Morales to relate that Ms. Thorson had related to him [Morales] that she was "afraid or scared" of Saxer. Morales was also permitted to tes-

tify that he and Thorson owed Saxer money for marijuana and, conversely, that they provided Saxer with marijuana. Morales did clarify the fact that in providing Saxer with marijuana, he and Thorson did not "short" Saxer, but they did split an amount of marijuana with Saxer that was already short. The trial court found this testimony relevant and admissible as evidence of motive and of the relationship between Saxer and Ms. Thorson. The trial court also found that the probative value of Morales's testimony was not substantially outweighed by unfair prejudice to Saxer.

We agree with the trial court that Morales's testimony was relevant as a possible motivating factor, regardless of how strong or weak, for the killing of Ms. Thorson by Saxer. It certainly provided evidence of the prior relationship between Saxer and Ms. Thorson for use by the jury as it saw fit. As such, it was admissible under Rule 404(b) because it was being used for purposes other than mere character conformity. Finally, we do not find its admissibility to have been a violation of Rule 403 as its probative value was not so slight so as to be substantially outweighed by the danger of unfair prejudice to Saxer. *See Montgomery,* 810 S.W.2d at 389–90. Issue Three is overruled.

The extraneous act/offense testimony in question under Issue Four came from the State's witness, Lisa Garcia. Recall that the evidence indicated that about one week prior to Ms. Thorson's murder, Mr. Morales, Ms. Thorson, and Mr. Morales's stepfather had helped Saxer's wife, Susan, move out of the Saxer's apartment. Saxer was entirely unaware of this event until he returned home from work. Finding his wife had moved out, Saxer went to Lisa Garcia's apartment as she was the manager of the complex. Garcia was asked on direct examination what Saxer's state of mind was and she responded that he

seemed a little upset. Garcia further explained that, although she knew the whereabouts of Susan Saxer, Garcia told Saxer she did not know where his wife was. All of this testimony was admitted over a timely objection based upon violations of Rules 404(b) and 403. Garcia's description of these events culminated with the testimony describing Saxer's comment, "if he [Saxer] found out who helped her [Susan Saxer] move out, he was going to kill them."

The State apparently offered the testimony in question as evidence relevant to "motive," and also as possibly relevant to show Saxer's "state of mind." The discussion at the bench prior to Ms. Garcia's testimony indicates Saxer pointed out to the trial court that, in addition to a violation of Rule 404(b) and Rule 403, Ms. Garcia's testimony was not relevant because:

> [T]here has been no showing from the State that Mr. Saxer even knew—if, in fact, the statement was made, that Mr. Saxer knew that Morales and Thorson were supposedly the persons and—as well as Garcia were the persons who were responsible for helping Ms. Saxer move. So, therefore, that nexus has not been made.

The trial court immediately overruled all of Saxer's objections to Ms. Garcia's testimony.

We must initially review two cases which appear to touch on the relevancy of evidence such as at issue here. In *Alba v. State,* 905 S.W.2d 581, 586 (Tex.Crim.App. 1995), the defendant, convicted for killing his wife, claimed error by the trial court in refusing to admit evidence of his wife's extramarital affair. The Court found no error by the trial court as the defendant had not produced any evidence that he was aware of his wife's infidelity when he killed her. *Id.* Similarly, in *Jernigan v. State,*

585 S.W.2d 701, 704 (Tex.Crim.App. 1979)(and cases cited therein), the Court recognized a line of cases holding that evidence of a wife's extramarital relationship is admissible to show motive to kill only if it is also established that the husband-defendant knew of the relationship. In the instant case, we can find no record evidence that Saxer was aware of who helped his wife move at any time prior to the murder of Ms. Thorson.

 Nevertheless, we find relevance to this testimony, although under a very slim reed. Ms. Garcia's testimony does provide the fact-finder with some evidence of possible homicidal tendencies on Saxer's part. As it was relevant to show Saxer's mental state a few days prior to the murder, it was also admissible under Rule 404(b) as it had relevance apart from mere character conformity. As for Ms. Garcia's testimony being substantially more unfairly prejudicial than probative, we see it as a close question. However, as we noted in a similar "close call," the effect of Ms. Garcia's testimony is not unfairly prejudicial "because the prejudicial effect lies in its probative value rather than [in] an unrelated matter." *See Robbins v. State*, 27 S.W.3d 245, 251 (Tex.App.-Beaumont 2000), *aff'd*, 88 S.W.3d 256 (Tex.Crim.App.2002). Ultimately, we cannot say the trial court erred in its balancing of the factors under Rule 403, especially the "need" of the State for the extraneous act/offense testimony. *See Montgomery*, 810 S.W.2d at 389–90. Issue Four is overruled.

Issue Five presents us with the most vexing of any of Saxer's extraneous act/offense complaints. It was offered by the State as relevant to show Saxer's "state of mind" under art. 38.36, and Rule 404(b). At the outset, we note that the evidence in question, Saxer's ingestion of methamphetamine several hours prior to the murder of Ms. Thorson, does not immediately strike us as having that quality of "mental state" evidence we had before us in Issue Four in that Ms. Garcia's testimony, arguably, did indeed have a "tendency" to relate to the possibility that Saxer possessed a homicidal mental state just a few days prior to the murder. It was therefore probative as evidence tending to establish his identity as the killer of Ms. Thorson. Under Issue Five, however, we are provided with neither direct nor circumstantial evidence from the State as to what effect, if any, Saxer's ingestion of methamphetamine had on his "state of mind" at the time of the ingestion, minutes later, or even hours later when the killing took place. Such an infirmity in the State's proof with regard to a similar extraneous act/offense issue was found to be fatal when offered for proof of "motive" for murder. *See Lopez v. State*, 928 S.W.2d 528, 532 (Tex.Crim. App.1996). We again turn to *Montgomery* for guidance.

In reviewing an evidentiary complaint under Rule 404(b), *Montgomery* directs appellate courts to begin with a relevancy analysis. *Id.* at 390–91. The Court notes that because the definition of "relevance" under Rule 401 is "necessarily a broad one," deciding what particular type of evidence meets the definition "will not always be cut and dried." *Id.* at 391. The Court immediately crystalizes the role of the trial judge, under our adversarial system, as the person with "the best vantage from which to decide" the initial relevance question. *Id.* Furthermore, the initial relevancy decision is not exclusively a function of rule and logic, but, most importantly for the analysis before us, requires the trial judge to rely in large part on his/her "own observations and experiences of the world, as exemplary of common observation and experience," reasoning from there to the ultimate relevancy decision. *Id.* We set out the language from *Montgomery* lead-

ing to the test for a reviewing court when confronted with a question of evidentiary relevance:

> The determination of relevance, *vel non,* thus depends upon one judge's perception of common experience.... The process cannot be wholly objectified. Reasonable men may disagree whether in common experience a particular inference is available. Where there is room for such disagreement, an appellate court that reverses a trial court's ruling on relevancy accomplishes nothing more than to substitute its own reasonable perception of common experience for that of the trial court....
>
> To avoid this anomaly, appellate courts uphold the trial court's ruling on appeal absent an "abuse of discretion." ... The trial court's ruling is not, however, unreviewable. Where the appellate court can say with confidence that by no reasonable perception of common experience can it be concluded that proffered evidence has a tendency to make the existence of a fact of consequence more or less probable than it would otherwise be, then it can be said the trial court abused its discretion to admit that evidence. Moreover, when it is clear to the appellate court that what was perceived by the trial court as common experience is really no more than the operation of a common prejudice, not borne out in reason, the trial court has abused its discretion....

*Id.* at 391.

Under *Montgomery,* therefore, we must give great deference to the trial court in decisions on relevancy especially when it could involve the trial judge's "common observation and experience" based upon his/her "own observations and experiences of the world." In analyzing Issue Five, we cannot ignore the discussion that took place out of the hearing of the jury as the State informed the trial court and Saxer that it was about to proffer the testimony in question. We reproduce that colloquy as it appears in the record before us:

(NOON RECESS WAS TAKEN; JURY NOT PRESENT)

[State]: Your Honor, I spoke with counsel before you came in. There is a potential 404(b) matter that we probably want to take up before this next witness.

THE COURT: That's fine. Okay.

. . . .

[State]: Our next witness, Mr. Patrick Sparks, is going to testify; and I anticipate he will testify that on the morning of 6–1 of 2000, that he received a call from the defendant and that this defendant wanted him to bring some crystal meth to his apartment. I anticipate he will also testify he later did bring some methamphetamine and that both of them ingested, used, whatever the term is, this illegal substance. And we are offering that, the relevancy of it on the intent issue, the mental state.

Also, I'm not even convinced it is 404(b) because I believe it shows the circumstances of the crime and the defendant's state of mind, which is relevant under 38.36. And also—

THE COURT: You say it is relevant under 38.36?

[State]: Well, 38.36 discusses evidence or circumstances that show the defendant's state of mind, in addition to the relationship prong of it.

THE COURT: So, you're offering it as it being relative or probative is the fact that he was high or under the influence of some drug?

[State]: Yes, Your Honor.

THE COURT: This was what, two to three hours prior to the occurrence?

[State]: Actually, about—about an hour prior to the occurrence.

THE COURT: Okay. What's the defendant have to say?

[Trial Counsel]: Your Honor, obviously, it's—obviously, this is just another attempt to convict Mr. Saxer because someone says he used drugs at a party, which I submit was, according to my investigative knowledge of this case, hours before the—I don't know when the State is claiming that Emily Thorson was actually killed. I mean, I assume we could speculate, based on what we've heard so far, sometime around noon or sometime in that area or before noon. But we're talking about a gathering the night before that went into, I thought, the early morning hours.

[State]: If I may respond, Your Honor. That's not what we're talking about. What we're talking about is sometime around 9:00 o'clock, 8:30 to 9:00 o'clock that morning, the witness, in response to a call from the defendant, showed up at the defendant's apartment and he had crystal meth with him. They sat around for another hour or so and used crystal meth. And our—our position and our evidence will show that she was killed before noon.

So, the relevancy would be that at the time of the offense, that the defendant committed the offense, he was under the influence of a controlled substance, much like if he had been drinking alcohol; that that type of intoxication would be relevant to his mental state at the time that it occurred, at the time the murder occurred.

THE COURT: Well, yeah, I hear what you are saying. I guess—I assume it's relevant. You know, it's certainly probative on what was in his body and how his mind may be working.

I don't know. It's also prejudicial, and all that is sort of a weighing thing really, I guess, is what it boils down to,

is how—what is the probative value as opposed to the prejudicial impact of it.

[Trial Counsel]: Your Honor, the only evidence we've heard of anything about drugs as far as involving the defendant has been marijuana.

THE COURT: Well, but you're fixing to hear something else. That's what counsel is saying.

[Trial Counsel]: And, I guess—

THE COURT: The fact you don't believe the witness really doesn't help me any.

[Trial Counsel]: I don't see how its probative value out—I mean, its probative relevance value outweighs—outweighs its prejudicial effect to the jury. We don't have any, you know, you don't—the only evidence, you know, of any kind of consumption for—and frankly, I'm surprised, because none of this is anywhere in Mr. Sparks' statement, which I understand I can cross-examine him with.

THE COURT: Uh-huh. Well, is this giving you—were you given notice of this under your 404(b) notice?

[Trial Counsel]: No, sir.

THE COURT: Counsel is nodding "yes"; you're nodding "no." Somebody show me.

[Trial Counsel]: Oh, yes. Well, I'm not sure I was.

THE COURT: Well, your—

[Trial Counsel]: Not of crystal meth.

THE COURT: Your recently graduated assistant is nodding "no," and I don't know who knows. Let's look. I'm not asking about notice of the witness. Notice of that particular 404(b) circumstance, which seems to be the issue.

And while you're looking, Mr. [State], the time frame between this drug use and the killing was what? Are you saying two or three hours, ballpark?

[State]: About an hour, hour and a half.

THE COURT: Okay. And the witness that you're proffering actually went to the defendant's apartment?

[State]: Yes, Your Honor.

[We omit the subsequent discussion and resolution of the "notice" issue]

THE COURT: Anybody have any cases specifically on drug or alcohol consumption at or prior to the—this really isn't res gestae, but it's immediately prior thereto. Anybody have any research on that?

Your offer is limited, or at least you're offering it under the theory of state of mind, you said?

[State]: State of mind, Your Honor.

THE COURT: It's relevant on intentional and knowing, in other words?

[State]: Right.

It's also, Your Honor, given the time frame, I believe it would fall within the same transaction of events leading up to and occurring after.

THE COURT: Anybody have any cases?

[Trial Counsel]: No.

THE COURT: No cases from either side. I'm going to overrule the objection; however, I will give an instruction, if counsel wants one, from the defendant's viewpoint.

[Trial Counsel]: We do want an instruction. Co-counsel will state it for the record.

The record indicates that immediately prior to the testimony in question from Sparks, the trial court gave the following verbal instruction to the jury:

THE COURT: I'm going to stop you right there, young man, for just a minute.

Ladies and gentlemen, you are going to hear some evidence now or some testimony from this witness. I'm going to give you this instruction, and you should consider this evidence under this instruction: I'm allowing the testimony and it is being admitted for the limited purpose to show the state of mind, if it does, of the defendant at the time discussed here by this witness. That's how you will accept that evidence and that's how you will consider it; for the limited purpose to show state of mind, only that, if it does, of the defendant. Okay.

You can proceed, sir.

■ Although we are unable to find evidence in the record of what effect, if any, the ingestion of methamphetamine had on Saxer's state of mind, we cannot say "with confidence that by no reasonable perception of common experience can it be concluded" that Saxer's ingestion of methamphetamine, shortly before the murder was committed, had no tendency whatever to make it more probable that he was the perpetrator of the murder. We cannot say that what appeared to be the trial court's perception of the methamphetamine-ingestion testimony—that Saxer was "high or under the influence of some drug,"—was no more than "the operation of a common prejudice, not borne out in reason," as opposed to "common experience." See Montgomery, 810 S.W.2d at 391. In determining relevance, courts refer to "logic and common experience." See Rankin v. State, 974 S.W.2d 707, 718 (Tex. Crim.App.1996) (quoting Montgomery, 810 S.W.2d at 391). From the evidence of drug use, it may be inferred that defendant's reasoning was altered. Giving all deference due to the trial court as we must, we find no abuse of discretion with its ruling on relevance.

■ With regard to admissibility under Rule 404(b), the drug-ingestion testimony

was offered by the State for a purpose other than simple character conformity, i.e., "state of mind" or "mental state." Therefore, being relevant to that purpose, it is also admissible under Rule 404(b). We now move on to consider whether, notwithstanding its relevance and admissibility under Rule 404(b), the drug-ingestion testimony was nevertheless inadmissible under Rule 403.

*Montgomery* sets out a non-exclusive list of relevant criteria upon which a reviewing court must measure the trial court's ruling. *Montgomery*, 810 S.W.2d at 392–93. We examine the trial court's ruling in light of the following: (1) whether the ultimate issue was not seriously contested by the opponent; (2) whether the State had other convincing evidence to establish the ultimate issue to which the extraneous act/offense evidence was relevant; (3) whether the probative value of the extraneous act/offense evidence was not, either alone or in combination with other evidence, particularly compelling; and/or (4) whether the extraneous act/offense evidence was of such a nature that a jury instruction to disregard it for any but its proffered purpose would not likely have been efficacious. *See id.*

■■■ In the instant case, the ultimate issue—the identity of the killer—was indeed contested by Saxer's defense team. As can be gleaned from our rendition of the evidence in our legal and factual sufficiency analyses, Saxer's trial counsel laid the groundwork for an alternative theory of the killer's identity, *viz:* that the killer was Saxer's friend, John Sayers.[2] As is also evident from our rendition of the record facts, the State's circumstantial evidence relied on the jury making inferences favorable to the State's "theory" of the

case as well as making credibility determinations favorable to the State.

As for the probative value of the drug-ingestion testimony being "compelling" in nature, in and of itself it was not. Only when combined with the State's description of the murder to the jury as having been "methamphetamine-induced" and "drug induced" was the testimony's "compelling" nature fully realized. Finally, we feel the trial court's wording of the limiting instruction was quite effective because of the significant "limiting" words used. The trial court admonished the jury that the drug-ingestion testimony was being admitted for a "limited purpose," that being to show Saxer's state of mind "if it does," and the jury was only to "accept" and "consider" the testimony "for the limited purpose" to show Saxer's state of mind "only that, if it does[.]" In short, the jury was very specifically instructed to limit their consideration of the testimony to Saxer's state of mind "only" and "if it does."

■■■ A reviewing court may not reverse a trial court when its ruling on a Rule 403 objection, either admitting or excluding evidence, was within the "zone of reasonable disagreement." *Montgomery*, 810 S.W.2d at 391. *See also Sunbury v. State*, 88 S.W.3d 229, 235 (Tex.Crim.App. 2002)("Zone of reasonable disagreement" doctrine applies when trial court exercises its discretion under Rule 403 and weighs probative value against the risk of unfair prejudice.) In the instant case, the trial court did engage in a Rule 403 balancing test. Under the detailed guidance set out in *Montgomery* for appellate courts faced with reviewing the admissibility or exclusion of evidence under Rules 401, 402, 404(b), and 403, we are unable to say the

---

**2.** Trial counsel admitted this defensive theory to the trial court and the State during two bench conferences.

trial court abused its discretion in admitting the methamphetamine-ingestion testimony of Patrick Sparks. Issue Five is overruled.

Issues Six and Seven revolve around Saxer's attempt to "impeach" State's witness John Sayers by asking if Sayers had ever been in the business of selling drugs. The State objected and a lengthy bench conference followed. It should be noted that during direct examination, it was elicited from Sayers that, at the time of the murder, he was on probation out of Walker County, Texas, for possession of a controlled substance, and that subsequent to June 1, 2000, the Walker County probation had been revoked based upon commission of a new offense out of Montgomery County, Texas, for possession of a controlled substance. There was much more impeachment of Sayers's credibility prior to trial counsel's question regarding "selling drugs."

At the bench conference, the trial court questioned Saxer's trial counsel as to any good faith belief that Sayers had ever sold drugs. Trial counsel admitted that he did not have "any specific evidence[.]" The discussion continued to a point at which the trial court offered trial counsel "20 minutes" to question Sayers out of the jury's presence in order to establish whether Sayers was indeed a drug dealer. Trial counsel declined the trial court's generous offer by saying, "I don't want to waste anybody's time." Whereupon, the trial court practically begged trial counsel to reconsider the offer, with the trial court concluding with the following:

THE COURT: Okay. If, in fact, there was some link, okay, with what you are going to offer later or it was already here, even a weak link, I would let you go for it. But right now, I don't have that link, is the problem. You are attempting to impeach him on a collateral matter, and that's not admissible under 404. And it has no bias or prejudice because there is no proof of it. You are just throwing it out there to see if it sticks. That doesn't get it.

I will give you some time outside the presence of the jury, if you want, to see if you can get somewhere with it.

[Trial Counsel]: You will not let me ask him if he used drugs the evening he was at Norman Saxer's house?

THE COURT: I think I will let you ask that, sure.

[Trial Counsel]: Then I'd rather—I think I'd just rather move on.

THE COURT: Okay.

 Trial counsel then proceeded to eventually ask Sayers if he used "narcotics" at Saxer's apartment the night before the murder, to which Sayers replied that he did use narcotics at that time. Trial counsel did not attempt to develop the "selling drugs" line of inquiry any further. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and in case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer, or was apparent from the context with which questions were asked. TEX.R. EVID. 103(a)(2). In the instant case, trial counsel did not attempt to elicit a response from Sayers to his "selling drugs" question, *even when given the full opportunity to do so by the trial court.* Additionally, trial counsel rejected the trial court's offer to pursue the line of inquiry in order to provide the proper predicate, as the trial court saw it, for ultimately being able to attempt to "impeach" Sayers with the "selling drugs" question. Frankly, we do not see where trial counsel received a definitive "adverse ruling" with regard to his ability to ask Sayers the "selling drugs" question at issue. *See Ramirez v. State,*

815 S.W.2d 636, 643 (Tex.Crim.App.1991). Furthermore, trial counsel appeared to have abandoned the "cause" by affirmatively telling the trial court he would "move on." We also find it difficult, under this particular set of circumstances, to see how Saxer's "substantial rights" were affected by the inability to ask Sayers about "drug selling." *See* Tex.R. Evid. 103(a)(2). As such, we find Saxer has not preserved his complaints under Issues Six and Seven for appellate review. *See also Martinez v. State*, 91 S.W.3d 331, 336 n. 12 (Tex.Crim. App.2002). Issues Six and Seven are overruled. The judgment and the sentence of the trial court are affirmed.

AFFIRMED.

DON BURGESS, Justice, dissenting.

I respectfully dissent. I disagree with that portion of the majority opinion analyzing issues three, four and five under "EXTRANEOUS OFFENSES."

Saxer complains it was error for the trial court to permit Lisa Garcia to testify that appellant had told her almost one week before the murder that if he, Saxer, found out who helped his wife move out, he would kill them; and error for the trial court to permit Patrick Sparks to testify that appellant ingested methamphetamine on the morning of June 1, 2000. Ms. Garcia's testimony of Saxer's statement upon learning his wife had moved out of the apartment was never tied to any evidence that Saxer later learned, prior to the murder, that Ms. Thorson, among others, helped his wife move out. The State proffered this evidence as admissible under Rule 404(b) as "motive." The trial court opined Garcia's testimony of Saxer's statement was also admissible, in the face of any hearsay complaint, as "a statement by a party opponent." *See* Tex.R. Evid. 801(e)(2)(A). The trial court also performed a Rule 403 analysis finding any prejudicial effect of the testimony "does not outweigh the probative value[.]" The trial court recognized Saxer's timely objection under Rule 404(b) and Rule 403 and granted him a running objection on the testimony in question.

An objection based upon a violation of Rule 404(b) demands a relevancy analysis. *Rankin v. State*, 974 S.W.2d 707, 709 (Tex.Crim.App.1996)(opinion on original submission). Evidence is relevant that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tex.R. Evid. 401. However, as this court noted in *Fleming v. State*, 987 S.W.2d 912, 921 (Tex.App.-Beaumont 1999), *pet. dism'd, improvidently granted*, 21 S.W.3d 275 (Tex.Crim.App.2000), relevance is not an inherent characteristic of any item of evidence but exists as a relation between an item of evidence and a matter properly provable in the case. This involves, among other things, making sure that the proffered extraneous bad act/offense evidence has *logical* relevance to the non-character conformity purpose for which it is offered. *See Powell v. State*, 63 S.W.3d 435, 438 (Tex.Crim.App.2001)(quoting from *Montgomery v. State* in observing that extraneous act evidence "has noncharacter conformity relevance where it logically serves to make less probable defensive evidence that undermines an elemental fact.")

In *Rankin*, the Court observed that when we say evidence is "relevant," in terms of Tex.R. Evid. 402[3], we are saying

3. Texas Rule of Evidence 402 reads: "All relevant evidence is admissible, except as otherwise provided by constitution, by statute, by these rules or by other rules prescribed pursuant to statutory authority. Evidence which is not relevant is inadmissible."

that the evidence makes a "fact of consequence" in the case more or less likely. *Id.* at 709. As noted by the *Rankin* Court, *Montgomery* explained the relevancy dynamic in the following way:

> [A] party may introduce such evidence where it logically serves "to make ... more probable or less probable" an elemental fact; where it serves "to make ... more probable or less probable" an evidentiary fact that inferentially leads to an elemental fact; or where it serves "to make ... more probable or less probable" defensive evidence that undermines an elemental fact.

*Rankin,* 974 S.W.2d at 710 (quoting *Montgomery,* 810 S.W.2d at 387). *Rankin* further warns reviewing courts considering the relevancy of evidence to beware of the following pitfall:

> An evidentiary fact that stands wholly unconnected to an elemental fact, however, is not a "fact of consequence." A court that articulates the relevancy of evidence to an evidentiary fact but does not, in any way, draw the inference to an elemental fact has not completed the necessary relevancy inquiry because it has not shown how the evidence makes a "fact of consequence" in the case more or less likely.

*Rankin,* 974 S.W.2d at 710.

In the instant case, the State's proffer of Saxer's statement to Garcia that he would kill whoever helped his wife move out, *at the time it was offered into evidence,* had only conditional relevancy with regard to motive. For the condition to be removed, the State would also have to prove directly, circumstantially, or inferentially, that Saxer eventually became aware that Ms. Thorson did indeed help his wife move out. In the analogous evidentiary circumstance noted above, a substantial line of case-law holds that evidence of a wife's extra-marital relationship is *not admissible* to show

motive to kill *unless* it is also shown that the defendant-husband was aware of the relationship. *See Jernigan v. State,* 585 S.W.2d 701, 704 (Tex.Crim.App.1979)(and cases cited therein). Therefore, at the time the State proffered the testimony in question, the State had not provided the evidentiary link that would show Saxer's statement "made it more probable" that Saxer had a motive for murdering Ms. Thorson and that the motive was because he knew, or even suspected, that she helped his wife move out of the apartment. Because the record is silent as to this small but vital link tying Saxer's statement to subsequent knowledge on his part that Ms. Thorson had helped his wife move out, the statement was not relevant to prove an evidentiary fact that inferentially leads to an elemental fact, the identifying of Saxer as the murderer. I believe the trial court abused its discretion in admitting this testimony of Ms. Garcia.

With regard to Issue Five, prior to Sparks's testimony being presented to the jury, both parties and the trial court discussed its admissibility. The State proffered the testimony as "circumstances of the crime" and to show Saxer's "state of mind" under TEX.CODE CRIM. PROC. ANN. art. 38.36 (Vernon Supp.2003). The bench conference discussed issues implicating TEX.R. EVID. 401, 404(b), and 403. As noted above, the trial court permitted the State to elicit the testimony in question from Sparks but provided a limiting instruction to the jury. In making its ruling, the trial court specifically found the testimony to be relevant, admissible under Rule 404(b) as going to Saxer's "state of mind," and that its probative value was not substantially outweighed by the danger of unfair prejudice.

Article 38.36 of the Texas Code of Criminal Procedure is entitled, "Evidence In Prosecutions for Murder." *See* TEX.

CODE CRIM. PROC. ANN. art. 38.36 (Vernon Supp.2003). Article 38.36(a) reads as follows:

In all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense.

In *Smith v. State*, 5 S.W.3d 673, 679 (Tex. Crim.App.1999), the Court of Criminal Appeals held that evidence admissible under article 38.36(a) may be excluded under TEX.R. EVID. 404(b) and 403. Specifically, the Court stated that if a defendant makes a timely 404(b) or 403 objection, before a trial court can properly admit the evidence under article 38.36(a), it must first find the non-character conformity purpose for which it is proffered is relevant to a material issue. *Id.* If the proffered evidence is relevant to a material issue, the trial court must then determine whether the evidence should nevertheless be excluded because its probative value is substantially outweighed by the factors in Rule 403. *Id.*

In the instant case, the State proffered the methamphetamine ingestion testimony for the purpose of showing Saxer's "mental state" or "state of mind." The trial court immediately responded by stating: "So, you're offering it as it being relative or probative [of] the fact that he was high or under the influence of some drug?" The State replied, "Yes, Your Honor." After further discussion of admissibility of the testimony the trial court made the following comment:

Well, yeah, I hear what you are saying. I guess—I assume it's relevant. You know, it's certainly probative on what was in his body and how his mind may

be working. I don't know. It's also prejudicial, and all that is sort of a weighing thing really, I guess, is what it boils down to, is how—what is the probative value as opposed to the prejudicial impact of it.

It appears both the State and the trial court were under the impression that testimony that appellant ingested methamphetamine in what appears, from other testimony, to be two to three hours before the murder, was relevant to Saxer's "state of mind." I have carefully examined the entire record and find no attempt by the State to show how the ingestion of methamphetamine works on the mind of a human being, much less on Saxer's mind. The trial court suggested that such testimony would be probative to show Saxer was "high or under the influence" of the drug.

Nevertheless, the record does not contain a shred of evidence as to how methamphetamine affects individuals in general or if there is a commonly recognizable symptom or symptoms among individuals who ingest the drug. While it may be logical to infer that ingestion of a contraband substance results in some alteration of the mental or physical state of the person in question, it is impossible to make the inferential leap required by the State in the instant case that Saxer's ingestion of methamphetamine resulted in a mental state prone to committing acts of intense violence. In terms of the analysis discussed in *Rankin, supra,* there was a failure by the State, as well as the trial court, to draw any inference between Saxer's methamphetamine ingestion and an elemental fact in the case. As "common scheme or plan" was not an elemental fact of the charged offense of aggravated sexual assault in *Rankin,* so too in the instant case "state of mind" is not an elemental fact of the charge of murder. As prof-

fered by the State, Saxer's methamphetamine ingestion, standing alone, was not relevant to any "fact of consequence" involved in the instant prosecution. This is so because, like the erroneously admitted testimony of Ms. Garcia described above, Saxer's methamphetamine ingestion was not an elemental fact that inferentially led to the ultimate elemental fact, the identifying of Saxer as the murderer. Testimony or evidence described in article 38.36(a), including the "condition of the mind" of the defendant, is admissible with the explicit proviso that it first be relevant. *See* Tex. Code Crim. Proc. Ann. art. 38.36. I would hold, therefore, that the trial court abused its discretion in admitting the testimony of Saxer's ingestion of the methamphetamine on the morning of the murder. *See Rankin*, 974 S.W.2d at 719 (opinion on rehearing).

There being trial error, there must now be a "harm" analysis. *See Cain v. State*, 947 S.W.2d 262, 264 (Tex.Crim.App.1997). In *Johnson v. State*, 43 S.W.3d 1, 5 (Tex. Crim.App.2001), the Court held that it is the responsibility of the appellate court to assess harm after reviewing the record and that the burden to demonstrate whether the appellant was harmed by a trial court error does not rest on the appellant or the State. In the instant case, the appropriate standard for reviewing for "harm" is to disregard the error unless a substantial right has been affected. Tex. R.App. P. 44.2(b). A substantial right is affected when the error has a substantial and injurious effect or influence in determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex.Crim.App.1997). The following language taken from *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), has been adopted by reviewing courts in Texas as authoritative when conducting a substantial rights review under Rule 44.2(b):

If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress. But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that the substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

*Id.* at 764–65, 66 S.Ct. 1239. (citation and footnote omitted). *See also Johnson*, 43 S.W.3d at 4; *Morales v. State*, 32 S.W.3d 862, 867 (Tex.Crim.App.2000); *Jackson v. State*, 17 S.W.3d 664, 672 (Tex.Crim.App. 2000); *Dorsey v. State*, 24 S.W.3d 921, 930 (Tex.App.-Beaumont 2000, no pet.).

In a somewhat recent opinion, the Court of Criminal Appeals re-emphasized the necessity for a reviewing court to examine "the record as a whole" when conducting a harm analysis under Rule 44.2(b). *See Schutz v. State*, 63 S.W.3d 442, 444 (Tex. Crim.App.2001). As the Court noted, the reviewing court is to consider testimony, physical evidence, the nature of the evidence supporting the verdict, the character of the error and its relationship to other evidence, the trial court's instructions to the jury, the theories of the respective cases for the State and the defense, arguments to the jury, and relevant portions of the voir dire. *Id.* at 444–45.

While the *Schutz*, *Morales*, *Johnson*, *King*, and *Kotteakos* cases discuss stan-

dards by which reviewing courts are to measure harm stemming from non-constitutional trial error, we find useful the following language contained in *O'Neal v. McAninch*, 513 U.S. 432, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995):

> But we consider here the legal rule that governs the special circumstances in which record review leaves the conscientious judge in grave doubt about the likely effect of an error on the jury's verdict. (By "grave doubt" we mean that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error.) We conclude that the uncertain judge should treat the error, not as if it were harmless, but as if it affected the verdict (i.e., as if it had a "substantial and injurious effect or influence in determining the jury's verdict.")

*Id.* at 435, 115 S.Ct. 992 [4].

In conducting a proper "harm" analysis in the instant case, the most difficult steps will be to fully describe the "nature of the evidence supporting the verdict" as we carefully examine the entire record, and to fully explain the "character of the error and its relationship to other evidence." *Schutz*, 63 S.W.3d at 444–45. The character of the error was to provide to the jury what amounted to two "motives" for Saxer to have killed Ms. Thorson in a case where the evidence of motive for the murder rested on the thinnest of thin reeds. Even after all of the evidence was in, the State's theory of the case was still somewhat murky. The record indicates four specific "motives" advanced by the State: 1) the murder was "methamphetamine-induced"; 2) the murder was based upon Saxer's wanting sex from Ms. Thorson; 3) Saxer murdered Ms. Thorson based upon his

statement to Ms. Garcia that he would kill anyone who helped his wife move; and 4) Saxer murdered Ms. Thorson because she owed him money for marijuana. As I would hold that the testimony as to motives 1 and 3 was erroneously admitted, I will initially examine the strength of the evidence of the remaining two motives in our examination of the nature of the evidence supporting the verdict as well as the character of the error and how it related to other evidence.

**Wanting Sex From The Victim.**

The State relies on the following direct examination testimony by the State's witness, John Sayers:

Q. [State] Prior to June the 1st, did the defendant ever mention Emily Thorson to you?

A. [Sayers] He did.

Q. And did he ever indicate whether or not he had a relationship with Emily Thorson?

A. Not a relationship; as a friend, yes, sir.

Q. Did he ever indicate to you whether or not he desired to have a sexual—

[Trial Counsel]: Objection. Leading.

THE COURT: Sustained. Rephrase.

Q. (BY [State]) Did he ever indicate whether or not he wanted to have a relationship, other than a friendship, with her?

A. Yes.

[Trial Counsel]: Objection. Leading.

THE COURT: Overruled.

[Sayers]: Yes, he did.

Q. (BY [State]) And what type of relationship or experience did he indicate he wanted to have with her?

A. An intimate one.

---

4. Because Rule 44.2(b) is based upon Federal Rule of Criminal Procedure 52(a) we look to the Supreme Court for guidance in interpreting our "harmless error" rule. *See Johnson,* 43 S.W.3d at 4.

Q. He told you that?

A. Sitting around, drinking, yeah.

Q. And this was prior to June 1 st?

A. Yes, sir.

[State]: Pass the witness.

Earlier during Sayers's direct examination testimony it was elicited from Sayers that at the time of the murder, he, Sayers, was on probation out of Walker County, Texas, for possession of a controlled substance, and that subsequent to June 1, 2000, the Walker County probation was revoked based upon having committed a new offense out of Montgomery County, Texas, which also involved possession of a controlled substance. Sayers further testified he pleaded guilty to the Montgomery County charge and was serving a "jail sentence" in the Walker County Jail. Although Sayers insisted that he had made no deal with the State in exchange for favorable testimony, it was established under cross-examination that both a state jail felony conviction for possession of a controlled substance and a felony conviction for the same offense were to be served in county jail facilities; that in spite of the two recent drug convictions as well as prior convictions for misdemeanor family assault and felony bail jumping, Sayers made trusty at the Walker County jail facility which permitted him to have personal contact visits from relatives and access to phones. Sayers had no explanation for this seeming generosity on the State's part, nor did the State attempt to explain Sayers's bit of good fortune.

Sayers's credibility was no small matter to the defense as he was the key State's witness in that his testimony was the most solid of any that placed the murder weapon in the hands of Saxer in the early morning hours on the day of the killing. As noted above, Sayers also provided the account of Saxer's statement of his wish to be "intimate" with Ms. Thorson. As set out in the record, however, this particular testimony comes across as a bit of fantasizing undertaken during a round of drinks with the boys. It certainly does not take on the inference of an expression of demented lust, as the State would have the jury, and this Court, believe. The actual testimony was brief and otherwise innocuous in and of itself. Even taking it together with Spark's testimony that Saxer admitted to having "F" d" the victim earlier in the day on June 1, along with Saxer's cryptic "It's messed up," a motive for murder still does not immediately leap to mind. There is no other testimony or evidence from any source that there was any enmity between Saxer and Ms. Thorson at the time of the murder.

The following question and response does appear in the record during the direct examination of Ms. Thorson's fiance, Paul Morales: "Q.[State] Mr. Morales, did Emily ever express to you that she was afraid or scared of the defendant Norman Saxer? A.[Morales] Yes." Yet, the question is so global—"*ever express*"—that its probative value is somewhat limited as Morales had known Ms. Thorson for approximately six months prior to the murder. There is no other evidence from any source that Saxer was known for violence or had a temper or had ever threatened Ms. Thorson or Morales. Indeed, Morales testified that both he and Ms. Thorson "socialized" with the Saxers and were guests in the Saxer apartment on several occasions. In fact, it appears that Morales and Ms. Thorson socialized with the Saxers and with both Mr. Sayers and Mr. Sparks on more than one occasion. In short, after examining the entire record, the nature of this particular "motive" evidence is quite weak and almost non-probative of motive for murder on Saxer's part.

**Ms. Thorson Owed Saxer For Marijuana.**

Like the "sex" motive, the testimony developing this motive was also very brief. It is reproduced from the record as follows: "Q.[State] Did you ever owe him [Saxer] money for drugs? A.[Morales] Yes. Q. Okay. What kind of drugs? A. Marijuana." The record reflects that when the State argued this as a motive for murder by Saxer it would couple it with the argument that because Morales and the victim "shorted" Saxer some "drugs," this was an additional motive for murder. This appears to be a mistaken reading of Morales's testimony because the next questions to Morales provided the following responses:

Q. [State] And did you and Emily ever conversely provide the defendant any marijuana?

A. Yes.

Q. And prior to providing him that marijuana, did you take some of it out for you and Emily's own personal use?

A. Yes. We split it.

Q. You shorted him?

A. No. We split it. It was when I got it, it was already short.

As Morales explains, the amount of marijuana he and the victim were to provide to Saxer was already short when Morales received it, and that he and the victim simply split the shorted amount with Saxer. Again, this incident, like much of the other "motive," testimony, appears to exist in a virtual vacuum as there is no further evidence from any source even implying Saxer was angry or upset because of this disappointing transaction. The probative nature of this evidence with regard to motive for murder on Saxer's part is also very weak. This evidence appears to indicate that Morales, the victim, and Saxer were, at most, recreational drug users, and not in the "business" of dealing drugs. Indeed, among this group of social acquaintances, it appears that Patrick Sparks, by his own admission, was actually in the business of selling illegal narcotics.

I commend the State for the candid observation, contained in its brief under a discussion of the harmlessness of the admission of the extraneous bad act/offense testimony, that the "drug transactions" motive and the "helping his wife to move" motive for killing the victim was much weaker than the "sex" motive. Certainly having found the "helping his wife to move" motive irrelevant, I could not agree more with the State as such evidence would have no probative value at all with regard to motive to murder. In my view, however, the "drug transactions" motive is equally as weak, if not more so, than the "sex" motive. Again, in light of the entire record, the nature of the "drug transactions" motive evidence has virtually no probative value as proof of motive for Saxer to murder the victim.

**Nature Of Evidence Supporting The Verdict/ Character of Error Related to Other Evidence.**

An examination of the "nature of the evidence supporting the verdict" and "character of the error related to the other record evidence" in a "harmless" error analysis requires a look at all the evidence admitted before the jury without any "light most favorable," as there must be an attempt to ascertain "the likely effect of the error on the jury's verdict." *O'Neal,* 513 U.S. at 435, 115 S.Ct. 992, 130 L.Ed.2d at 951. The nature of the incriminating evidence against Saxer was essentially a "mixed-bag" of circumstances, most of which have two reasonable, but opposing, implications. The one solid and unshakable fact was that a spent bullet found near the body of the victim was eventually showed via ballistics tests to have come from the. 22 caliber handgun introduced as State's Exhibit 12. This handgun was

identified as having been in the possession of three individuals during the 24–hour period of June 1, 2000.

As noted above, Sayers testified he gave the handgun to Saxer in the early-morning hours of June 1, following Sayers's "road rage" incident. From Saxer, the handgun was passed onto Sparks sometime in the afternoon of June 1, following the shooting trip to Huntsville. Since the State's theory of the victim's time of death was before noon on June 1, the combined testimony of Sayers and Sparks circumstantially placed the murder weapon in Saxer's possession at the time of the murder. Yet both Sayers and Sparks had their credibility significantly impeached with criminal histories, and the fact that Sparks provided an incomplete written statement to the police when first interviewed, but later provided a second written statement somewhat more consistent with his trial testimony. It was also brought before the jury that Sayers and Garcia had been "lovers" while Sayers was apparently involved in a long-term relationship with Saxer's ex-wife, Crystal Spikes.

Sparks's testimony provided a good example of the "mixed-bag" nature of the evidence in the record. During Sparks's direct examination testimony, he stated that he received a phone call from Saxer sometime between 10:30 a.m. and 11:20 a.m. telling Sparks not to come by Saxer's apartment because Saxer had "a lady friend" coming over. However, during cross-examination, Sparks was asked about what he wrote in his second statement to the police, only days after the murder, in which he never mentions Saxer was expecting a "lady," but instead reads that Saxer "had someone coming over." Sparks was not asked to explain the disparity between his trial testimony and his written statement. In any other trial, the distinction would probably be of no consequence. In this case, however, any evidence from which incriminating circumstances could be inferred may have provided the final piece of the puzzle for the jury.

Another significant "mixed-bag" of testimony came from Lisa Garcia, the manager of the apartment complex where the murder occurred. Ms. Garcia was permitted to testify that six days before the murder Saxer's wife moved out, and that Saxer remarked to Garcia, "[I]f he found out who helped her move out, he was going to kill them." On cross-examination, Ms. Garcia was presented with the written statement she gave to the police on the day of the murder. The pertinent portion of this exchange reads as follows:

Q. [Trial Counsel] And when did you give this statement? Is there a date?

A. [Garcia] It was the 1st.

Q. June 1, the day that Emily was found dead. And in this statement you say, "On May 26, Emily helped Susan Saxer move out of her apartment leaving her husband, Norman Saxer. Norman Saxer told me—" and you have your name in parenthesis, correct? "If he found out that there was a man in his apartment helping her move out, helping her—" and then you have Susan Saxer in parenthesis— "or a man she was having an affair with, he would kill them." Now, is that what you told the police on June 1st?

A. Yes, sir. I was very confused that day.

Q. But you're not confused now. Ma'am? You're not confused now?

A. No, sir.

It would seem that in Ms. Garcia's written statement, the focus of Saxer's anger was clearly on the adulterous relationship, if there was one, between his wife and the unknown male paramour. In Ms. Garcia's

direct examination testimony, the focus of Saxer's anger was on any individual who aided his wife in moving. In Garcia's written statement, no motive for Saxer's killing of the victim can be inferred from his comment even if he had known the victim aided his wife in moving. In Garcia's trial testimony, had Saxer become aware of the victim's participation in the move, the statement would have been laden with motive. Again, small distinctions with huge repercussions appear because of the particular facts and circumstances in the record.

Much was made by the State that testimony from Sparks indicated Saxer was in a hurry to rid himself of the .22 caliber handgun and that when Sparks later learned of the murder and wanted to return the weapon, Saxer "got hostile" and told Sparks not to bring the handgun back. Yet, the entire reason that Saxer came into possession of the weapon in the first place was to help Sayers because Sayers did not want to be caught with it as it had been used by Sayers in his "minor altercation" with another vehicle at which time Sayers "show[ed]" the handgun to the other motorist. Later, Sayers took the weapon to Saxer's apartment, told Saxer about the altercation, and sold the handgun back to Saxer. That does not end the story, however, as Sayers was stopped by police the following day, June 1, around 11:30 a.m. Sayers was told by the police that they were investigating the altercation of the night before. The police searched Sayers's car and person. Soon after this encounter with the police, Sayers went to Saxer's apartment and told him that he had just been pulled over by the police and that the police were looking for the handgun. Sayers testified that Saxer told him to "burn the original receipt" that Sayers had received when Sayers purchased the handgun from Saxer approximately two months before.

Placed in context with the events described in Sayers's testimony regarding the murder weapon, the State's position that Saxer was anxious to pass the gun to Sparks because he had used it in the murder is somewhat less compelling. Once Sayers told Saxer that the police had stopped him and were looking for the handgun, it was reasonable for Saxer to want to get rid of it himself. From Sayers's point of view following his encounter with the police, the weapon was "hot." Why should Saxer not have thought the same? Ridding himself of the gun by selling it to a third party was certainly reasonable under the circumstances. The incriminating aura the State places on Sparks's testimony detailing the transfer of the handgun from Saxer is undoubtedly tarnished by the events described by Sayers regarding his experience with the police.

Another of the State's incriminating circumstances centered on the testimony of Sparks with regard to Saxer throwing items of clothing out of the vehicle window as the two men drove up Interstate 45 toward Huntsville for their shooting practice. Sparks remembered the general description of the clothing. Later that day, Sparks was interviewed by the police and recounted this incident, according to the testimony of Detective Eddie Davis of the Conroe Police Department. Based upon this information from Sparks, several police officers conducted a search of a "7– or 8–mile stretch" of Interstate 45 in hopes of recovering these items of clothing. This search was conducted over two consecutive days. While the officers collected a number of items of clothing, none matched Sparks's description of the clothes Saxer discarded. Undoubtedly, Saxer's actions in discarding the clothing was somewhat suspicious. However, Sparks did not testify that he observed blood on the clothing

nor do we have any testimony tying Saxer to having been seen in the same or similar clothing on the day of the murder. Again, on balance, all of the record evidence surrounding the discarding of the clothes is not strongly probative of Saxer's complicity in the murder.

Finally, there is the entirety of the testimony of Melissa Lewis McNeely, the representative of Saxer's church, who happened to be visiting another congregant in the apartment complex when she encountered Saxer. Ms. McNeely had a brief conversation with Saxer in which Saxer stated that he had just gotten home from a doctor's appointment, and that if he had not been at the doctor's he would have been in the state pen. Ms. McNeely further testified that until this encounter with Saxer she was unaware that he was employed as a correctional officer at the penitentiary. Once learning this, Ms. McNeely acknowledged that she took Saxer's previous comment as a joke. From this, the State argues that Saxer's comment was indicative of his guilt in that "he lied about his whereabouts." Yet taking Saxer's "lie" in the context of the entire record, it is only weakly indicative of an attempt to somehow cover his whereabouts or establish an alibi so as to escape suspicion for the murder. This is so because Saxer was openly seen or easily placed at the apartment complex for the entire morning and early afternoon hours of June 1. Mario Henson observed Saxer walking with the victim at about 11:35 a.m. Sparks had been with Saxer from around 8:00 a.m. to about 10:30 a.m. Sayers had contact with Saxer twice that morning—a phone call to tell Saxer of his encounter with the police and that the police were looking for the handgun, and the second time Sayers drove to Saxer's apartment to get a bottle of whisky left at Saxer's the night before. Sparks's testimony then ties Saxer at the apartment complex from about 11:00 a.m. onward,

virtually up to the time he and Saxer left for Huntsville to shoot the guns. All this is to say that the State's use of Ms. McNeely's testimony as proof that Saxer was trying to seriously provide an alibi for himself at the time the murder was supposed to have taken place is weak when taken in context with the entirety of the record evidence. Any serious probative value from Ms. McNeely's testimony as to Saxer's guilt is, again, thin at best.

When all of the record evidence is examined, it consists of what I have termed "mixed-bag" evidence which could have either an incriminating or innocent inference as to Saxer's guilt depending upon how the factfinder cared to resolve credibility or other circumstances surrounding the testimony; and the evidence includes facts and circumstances the inferences from which are weakly probative of Saxer's guilt.

I conclude by examining the jury arguments contained in the record. Significantly, the State begins and ends its argument by emphasizing the improperly admitted "methamphetamine ingestion" evidence. Specifically, the State begins its closing argument with the following two points:

> You heard from Dr. Shrode, and Dr. Shrode told you about the results of his autopsy. And that autopsy tells you the story, the story of what this defendant, Norman Saxer, in his methamphetamine-induced state of mind did to Emily Thorson the late morning hours of June the 1st, 2000.
>
> . . . .
>
> The evidence shows that the defendant, in his drug-induced state—you'll recall the testimony of John Sayers, that the defendant wanted to have sex with her.

Following this brief presentation, trial counsel for Saxer made their closing re-

marks, and then the State closed with its final remarks to the jury, concluding its remarks as follows:

Where is the testimony that the defendant had motive? Well, we know that the defendant wanted to have sex with her. We know that the defendant—we know that the defendant had a relationship with her and her boyfriend, her fiancé previously which involved drugs and that they had shorted him and that they owed him money for drugs. And we also know that Emily, out of the goodness of her heart, helped the defendant's wife move the preceding Friday and we know that the defendant was upset about this and we know that he threatened to kill people who had helped her move. Motive.

. . . .

So, Pat [Sparks], yes, he was a drug dealer at the time. He was all too willing to provide it, and he came over and he and the defendant shared some methamphetamine.

. . . .

You have the evidence before you to find the defendant guilty of this offense. You have the evidence showing that he had this gun in his possession, that he had the motive, that he had the opportunity, and that he had the mental state, that drug-induced mental state to intentionally and knowingly kill her, kill her on June the 1st in Montgomery County, Texas. And if Emily Thorson were here today, she could tell you what the defendant did to her, but she's not.

Ladies and gentlemen, I ask you to return a verdict of guilty in this case. Thank you.

The record reflects the State emphasized the erroneously admitted drug ingestion evidence on three occasions; at the beginning and at the end of its closing remarks, and also emphasized the erroneously admitted "kill-anyone-who-helps-wife-move" evidence. Each time the State summarized the "motives," it was essentially summarizing its theory of the prosecution. The core of Saxer's defense appeared to be an attempt to undermine the credibility of the State's key witnesses—Sayers, Sparks, and Garcia—and to raise the alternative theory that it was Sayers who was the murderer.[5]

At the conclusion of my exhaustive examination of the record in this case I am where the "conscientious judge" finds him/herself when he or she is in grave doubt about the likely effect of the trial court's errors on the jury's verdict. I certainly find myself with "grave doubt" as we find ourselves past "virtual equipoise." See O'Neal, 513 U.S. at 435, 115 S.Ct. 992, 130 L.Ed.2d at 951. That two clearly irrelevant "motives" were presented to the jury and emphasized during final argument by the State, coupled with the tenuous nature of the remaining two "motives," leads me to the belief that the errors could have had a substantial and injurious impact on the verdict. My "grave doubt" is reinforced by the fact that, because the key State's witnesses had their credibility seriously undermined, the nature of their testimony in support of the verdict, being entirely circumstantial in the first place, had a dark shadow cast over it. While weighing credibility of the witnesses and the weight to give to their testimony is entirely within the factfinder's prerogative, an appellate court is mandated to examine the *nature of the incriminating evidence*

<hr/>

**5.** Statements made at the bench, though not heard by the jury, are still part of the record if recorded. TEX.R.APP. P. 13.2(b)(3). *See Hayes*

*v. State*, 85 S.W.3d 809, 816 (Tex.Crim.App. 2002).

under a "harmless" error analysis. Obviously, if the incriminating nature of the evidence is strong and solid, the impact of the error on the jury may be slight. In this case, however, testimony is significantly weakened by credibility questions and is dominated by the relating of circumstances that at times requires strained inferences to reach an incriminating conclusion. I can only conclude that the errors did affect Saxer's substantial rights. Points of error three, four and five should be sustained. Consequently, the judgment should be reversed and the cause remanded to the trial court. Because the majority is of the opposite opinion, I respectfully dissent.